# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
### Civil Action No.: 5:19 CV 00099

| | |
|---|---|
| **COMMSCOPE, INC.,** | |
| **Plaintiff,** | |
| **v.** | **COMPLAINT** |
| **ROSENBERGER TECHNOLOGY (KUNSHAN) CO. LTD., ROSENBERGER ASIA PACIFIC ELECTRONIC CO., LTD., ROSENBERGER SITE SOLUTIONS, LLC, ROSENBERGER TECHNOLOGY LLC, ROSENBERGER USA CORP., ROSENBERGER HOCHFREQUENZTECHNIK GMBH & CO. KG, JANET JAVIER, and ROBERT CAMERON,** | **UNDER SEAL** **JURY TRIAL DEMANDED** |
| **Defendants.** | |

CommScope, Inc. ("CommScope"), for its complaint against Rosenberger Technology (Kunshan) Co. Ltd. ("Rosenberger China"), Rosenberger Asia Pacific Electronic Co., Ltd. ("Rosenberger Asia"), Rosenberger Site Solutions, LLC ("Rosenberger North Carolina"), Rosenberger Technology LLC (the "Rosenberger Asia Office"), Rosenberger USA Corp. ("Rosenberger USA"), Rosenberger Hochfrequenztechnik GmbH & Co. KG ("Rosenberger Germany") (collectively, "Rosenberger" or "Rosenberger Defendants"), and Janet Javier and Robert Cameron (collectively, "Individual Defendants," and together with the Rosenberger Defendants, the "Defendants"), alleges as follows on personal knowledge as to its own conduct, and on information and belief as to the conduct of others, except as otherwise indicated:

## INTRODUCTION

1. Plaintiff CommScope is a global leader in telecommunications infrastructure and is based in Hickory, North Carolina. CommScope's innovations in antennas and other wireless technologies have helped fuel the tremendous growth in connectivity worldwide. In addition to its other technologies, CommScope is a world leader in developing base station antennas ("BSAs"), which are a vital part of 21st century telecommunications infrastructure. Through years of research and development, CommScope has developed numerous trade secret technologies, including both software and hardware, that allow it to design, build, and validate its BSAs (CommScope's "BSA Trade Secrets"). Because of its best-in-class technology and commitment to customer service, all major United States wireless service providers use CommScope's BSAs. CommScope brings this case to stop the misappropriation of its BSA Trade Secrets and to protect the technology and customer relationships it has spent years and substantial resources developing.

2. The Rosenberger Defendants are part of a multinational conglomerate that competes with CommScope in the sale of telecommunications equipment, including BSAs. The Rosenberger Defendants have over a billion dollars in annual revenue. But rather than competing fairly Rosenberger is using stolen CommScope trade secrets.

3. The Rosenberger Defendants misappropriated CommScope's trade secrets, distributed them to Rosenberger entities around the world, and are now using them to develop, test, and sell infringing BSAs in the United States in direct competition with CommScope.

4. The misappropriation began with Rosenberger China. This Chinese entity engaged in a years-long campaign of targeted hiring of dozens of CommScope employees. It targeted CommScope employees for hiring because of their access to confidential CommScope

—2—

information, then enticed them away from CommScope by paying significantly above-market rates—sometimes as much as double current salaries. These above-market salaries reflect the premium Rosenberger places on employees' ability to bring over confidential CommScope information and the development costs Rosenberger can avoid by unfairly piggybacking off CommScope's research and development.

5. Rosenberger brought CommScope's information to the United States and is now using CommScope's trade secrets, including its trade secret software, at the Rosenberger Asia Office and the Rosenberger USA Office. Rosenberger is selling BSAs to CommScope customers in the United States that it designed and tested using CommScope's trade secret software. Rosenberger is also selling BSAs that are knockoffs of CommScope BSA products. And Rosenberger is selling components for use with its BSAs from a Rosenberger North Carolina distribution center in Charlotte, North Carolina. Rosenberger's actions are so blatant that it has even pitched CommScope's customers using materials that bear an internal CommScope acronym—CAPAC, where the first "C" is for "CommScope"—because they were generated using CommScope's trade secret software.

6. Rosenberger is engaging in these activities with the unlawful aid of former CommScope employees. Over the past year, Rosenberger hired two former CommScope employees: (a) Defendant Janet Javier, who was CommScope's Key Account Manager for one of its biggest customers, T-Mobile, and (b) Robert Cameron, who was a CommScope Applications Engineer. Javier and Cameron are now soliciting T-Mobile on behalf of Rosenberger, and using confidential CommScope information for Rosenberger's benefit, and Javier is soliciting additional CommScope employees to work for Rosenberger, all in violation of their CommScope

—3—

employment contracts. In those contracts, Javier and Cameron agreed to resolve any disputes regarding breach of the contracts in North Carolina court.

7.     In short, Rosenberger is using stolen CommScope software to create and validate BSAs that are knockoffs of CommScope hardware, and selling them to CommScope's customers with the unlawful aid of former CommScope staff. The Defend Trade Secrets Act, 18 U.S.C. §§ 1832 et seq., was designed to protect against exactly this type of misconduct—particularly where, as here, the perpetrator is a foreign actor that can easily evade detection by moving stolen information out of the country.

8.     CommScope brings this action to protect its intellectual property and contractual rights. Rosenberger should not be allowed to continue to benefit from its unlawful misappropriation of CommScope's trade secrets and confidential information, and Javier and Cameron should be required to abide by their contractual obligations to CommScope.

## THE PARTIES

9.     CommScope is a corporation organized under the laws of the state of Delaware, having its principal place of business at 1100 CommScope Place SE, Hickory, North Carolina.

10.     Rosenberger China is a subsidiary of Rosenberger Germany. It is a Chinese entity with its principal place of business in Kunshan, Jiangsu Province, China. It is majority owned by Rosenberger Asia.

11.     Rosenberger Asia is a Chinese entity with its principal place of business in Beijing, China. It is majority owned by Rosenberger Germany. It owns the Rosenberger Asia Office, a research and development center in Dover, New Jersey that designs and develops BSAs.

12.     Rosenberger North Carolina is a limited liability corporation organized under the laws of Delaware, having its principal place of business at 102 Dupont Drive, Lake Charles, Louisiana. It is 50% owned by Rosenberger USA. It operates a distribution center at 1430 West Pointe Drive, Charlotte, North Carolina which sells components designed for use with BSAs.

13.     The Rosenberger Asia Office is a limited liability corporation organized under the laws of New Jersey, having its principal place of business at 69 King Street, Dover, New Jersey. It is a subsidiary of Rosenberger Asia.

14.     Rosenberger USA is a corporation organized under the laws of Texas, having its principal place of business at 1100 Professional, Suite 100, Plano, Texas. It is a subsidiary of Rosenberger Germany and operates a facility located at 6970 Central Highway, Pennsauken, New Jersey 08109 (the "Rosenberger USA Office," or together with the Rosenberger Asia Office, the "Rosenberger New Jersey Offices").

15.     Rosenberger Germany is a German entity having its principal place of business at Hauptstrasse 1, Fridolfing, Germany. Rosenberger Germany is the ultimate parent entity of the other Rosenberger Defendants. The Rosenberger Defendants are private companies that are nonpublic entities.

16.     Janet Javier is an individual residing in Snoqualmie, Washington. Until August 3, 2018, Javier was an employee of CommScope. At the time of her departure, Javier was a Key Account Manager for CommScope's T-Mobile account.

17.     Robert Cameron is an individual residing in Carrollton, Texas. Until January 18, 2019, Cameron was an employee of CommScope. At the time of his departure, Cameron was an Applications Engineer.

—5—

## SUBJECT MATTER JURISDICTION

18.     This is a civil action for trade secret misappropriation arising under federal law in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA"); trade secret misapproriation in violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152 et seq.; unfair competition in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1; and breach of contract, tortious interference with contract, and civil conspiracy under the common law of the State of North Carolina.

19.     The Court has federal-question jurisdiction because the DTSA claim arises under federal law and federal law creates a private cause of action. The Court has supplemental jurisdiction over the state-law claims because they are supplemental to the federal claim under 28 U.S.C. § 1367.

## PERSONAL JURISDICTION

20.     This Court has personal jurisdiction over Rosenberger North Carolina because it operates a distribution center in Charlotte, North Carolina which sells components that can support and interact with Rosenberger BSAs that were designed, developed, and sold using misappropriated CommScope trade secrets.

21.     This Court has personal jurisdiction over Janet Javier and Robert Cameron because their employment agreements with CommScope contain forum-selection clauses in which they "consent[ed] to the exclusive jurisdiction and venue of the state and federal courts of Catawba County in North Carolina" for disputes arising under the agreements.

22.     This Court has personal jurisdiction over the Rosenberger Defendants because they are engaged in an unlawful conspiracy to misappropriate CommScope's trade secrets and

—6—

Rosenberger North Carolina has taken actions in furtherance of that conspiracy in North Carolina.

23.     This Court has personal jurisdiction over the Rosenberger Defendants and Javier because they tortiously interfered with employment contracts containing North Carolina forum-selection clauses.

24.     This Court has personal jurisdiction over Defendants because CommScope's claims arise from a common nucleus of operative fact with the breach of contract and tortious interference claims.

25.     This Court has personal jurisdiction over Rosenberger China and Rosenberger Germany for the DTSA claim because it arises under federal law, they are not subject to personal jurisdiction in any specific state, and they have sufficient contacts with the United States.

## VENUE

26.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to CommScope's claims occurred in this district; under 28 U.S.C. § 1391(c)(3) because Rosenberger Germany and Rosenberger China are not resident in the United States and may be sued in any district; and because Javier and Cameron consented to venue in the state and federal courts of Catawba County in North Carolina for disputes arising under their employment agreements with CommScope.

## FACTUAL BACKGROUND

### I.     CommScope is a Global Leader in the Wireless Infrastructure Industry

27.     CommScope is a leader in providing infrastructure for wireless networks. CommScope has a strong reputation for its leading technologies and best-in-class performance. Essential communications networks around the world run on its technology. CommScope

—7—

achieved its position as a market leader by investing in research and development, and by investing in developing close, long-term relationships with its customers.

28.     CommScope offers a complete portfolio of wireless network infrastructure products, including base station antennas ("BSAs"). A BSA is a complicated and valuable piece of equipment often seen attached to cellular towers or on rooftops. For example, the following are images of BSAs:

 

For scale, BSAs typically range from four to eight feet long.

29.     BSAs use radio frequencies to exchange signals with mobile devices like cell phones. They are technologically advanced devices that must be able to receive and transmit radio signals at great distance with minimal interference. Without BSAs, wireless networks, including networks across the United States, could not transmit the data sent over them every day.

### CommScope's Trade Secret Software

30.     Like CommScope's BSAs themselves, the processes CommScope uses to create them are also technologically sophisticated. During the antenna design, development, and testing

—8—

process, CommScope uses two trade secret software programs, called AAAP ("the Computational Software") and PSOAA ("the Simulation Software").

31.     The Computational Software is a sophisticated program for testing and evaluating antenna performance that is essential to CommScope's BSA design, development, and sales processes. CommScope's predecessor Andrew Corp.[1] spent years painstakingly developing the Computational Software in house; in fact, its name, AAAP, is short for the "Andrew Antenna Analysis Program." The Computational Software analyzes an antenna's three-dimensional radiation patterns and performs complex calculations to evaluate its performance along a variety of metrics, such as directivity, beamwidth, and sidelobe. It then generates graphs—called "rectangular plots" and "polar plots." For example, rectangular plots show a BSA's key parameters (such as its two-dimensional patterns, gain, beamwidth, and squint) calculated at each of its operating frequencies, while polar plots project a BSA's three-dimensional performance onto many different two-dimensional planes. This screenshot shows AAAP generating a rectangular plot based on data from a CommScope BSA:

--------------------

[1] As is discussed later, CommScope acquired Andrew Corp. in 2007.

—9—



32.     When designing BSAs, CommScope engineers use the Computational Software to explore many permutations of components and identify the best-performing configurations. It is a key ingredient and competitive differentiator in CommScope's antenna design workflow, enabling it to create more effective designs more efficiently. And once a BSA is developed, CommScope uses the Computational Software's plots in datasheets, customer presentations, and marketing materials. The Computational Software's plots give CommScope and its customers a reliable way to assess an antenna's quality and fit for the customers' needs. Customers would not buy BSAs without a way to reliably understand their performance along key metrics, such as is provided by the Computational Software.

33.     The Simulation Software is a complex modeling program that is also an important part of CommScope's BSA design process. Its name, PSOAA, is short for "Particle Swarm

—10—

Optimization Antenna Analysis." The Simulation Software calculates the expected performance of a BSA design, optimizes it along any of a number of different variables (such as directivity, beamwidth, and sidelobe), and enables engineers to further fine-tune the design by tweaking its parameters (such as amplitude, phase, and arrangement of radiating elements) and checking their impact on performance. CommScope created it through a painstaking multi-year design process. CommScope uses the Simulation Software to create virtual mockups of antennas so that it can evaluate their performance before developing physical models, saving it development time and improving the quality of its products.

## II. CommScope Invested Substantial Time, Effort, And Money To Develop Its BSA Trade Secrets, And Has Taken Reasonable Steps To Protect Them

34.     CommScope's BSAs are the result of years of concentrated research and development efforts. CommScope has expended a considerable amount of time and effort and large sums of money to develop confidential and trade secret information about its BSAs. CommScope's BSA Trade Secrets include information regarding the design of the devices themselves, as well as the methods and software programs (including the Computational Software and the Simulation Software) used to create them.

35.     CommScope has developed and employed reasonable measures to protect the confidential nature of the information about the processes and products it has developed. These measures include, without limitation, securing its buildings via physical measures, such as by requiring key cards and limiting visitor access; storing confidential materials like the BSA design documentation and the source code for the Computational Software and the Simulation Software on secure servers; requiring CommScope employees to sign a non-disclosure agreement upon joining the firm and to formally re-acknowledge their confidentiality obligations if and when they depart; and conducting an annual training on confidentiality.

—11—

36.     In addition, CommScope maintains both the Computational Software and the Simulation Software as proprietary and confidential and protects them from disclosure. CommScope (as well as its predecessor Andrew Corp.) developed both programs in-house and has not licensed them or otherwise made them available outside of the company.

### III.     Rosenberger's Misappropriation of CommScope's Trade Secrets

*Rosenberger Targets CommScope's Employees for Trade Secret Information*

37.     In the last few years, Rosenberger China has hired over a dozen CommScope employees who worked on CommScope's BSAs. The CommScope employees hired by Rosenberger include managers, supervisors, and the former lead R&D manager of the CommScope business unit with responsibility for BSAs. They include mechanical engineers— who had access to confidential information including design files and other engineering drawings for CommScope's BSA hardware—and radio frequency engineers, who had access to those materials as well as to CommScope's trade secret software programs, including the Computational Software and the Simulation Software. As a result, Rosenberger China's BSA unit is now loaded with former CommScope employees, including in leadership roles.

38.     Rosenberger enticed these employees away from CommScope by paying significantly above-market rates—sometimes as much as double current salaries. These above-market salaries reflect the premium Rosenberger places on employees' ability to bring over confidential CommScope information and the development costs Rosenberger can avoid by unfairly piggybacking off CommScope's research and development.

39.     Rosenberger uses these employees' knowledge of CommScope trade secrets, and the confidential information they were able to provide, to develop BSAs modeled on CommScope products. Rosenberger targets CommScope employees for hiring based on their

—12—

access to confidential information about products it wants to develop and then uses that information to develop them faster than would be feasible if it were competing fairly.

40.     Confidential CommScope information routinely flows from Rosenberger China to Rosenberger's locations in the United States, particularly to the Rosenberger New Jersey Offices. Several former CommScope employees now working for Rosenberger regularly travel from Rosenberger China to the Rosenberger New Jersey Offices. They include CommScope's former Radio Frequency Team Lead, Sun "Michelle" Jing, who travels regularly between the two. While at CommScope, Jing had access to CommScope's trade secret Computational Software and Simulation Software, as well as confidential CommScope information such as the design files for its BSAs.

41.     These employees act as conduits through which CommScope's BSA Trade Secrets flow between the United States and China.

42.     Rosenberger China is also using former CommScope employees in China to develop BSAs for sale in the United States.

### *Rosenberger's Misappropriation of CommScope's Trade Secret Software*

43.     Rosenberger obtained copies of CommScope's trade secret Computational Software and Simulation Software from former CommScope employees and is using those programs to develop and sell BSAs in competition with CommScope.

44.     **The Trade Secret Computational Software.** Rosenberger is using CommScope's trade secret Computational Software to validate and sell Rosenberger antennas to CommScope's customers.

—13—

45.     Rosenberger has created and distributed a presentation containing plots that appear identical to CommScope's plots. Rosenberger created the plots in this presentation using a misappropriated copy of the Computational Software.

46.     In addition, as part of an effort by Rosenberger to sell BSAs to Sprint, Rosenberger sent Sprint a presentation containing plots that look exactly like CommScope's plots.

47.     The Rosenberger presentation to Sprint includes compelling evidence that Rosenberger is using a stolen copy of the Computational Software. Indeed, as reflected in the red box below, the legends in the Rosenberger presentation use an internal CommScope acronym—CAPAC, which is short for "CommScope Antenna Performance Assurance Center":

# REDACTED

48.     The plots in the Rosenberger presentation to Sprint are indistinguishable from the plots created by CommScope's Computational Software. For example, the Computational Software labels each line in its plots using a fixed set of colors and shapes that is hard-coded into the software, so that each graph it creates uses the same colors and shapes in the same order. The Rosenberger plots label each line using those same colors and shapes, in the same order, as this comparison shows[2]:

| CommScope |  |
| Rosenberger |  |

The Rosenberger plots also use the same scale and formatting on the X and Y axes, and the same format for labels on the legend, as the Computational Software. For example, the legend on the left is from the Computational Software, while the one on the right is from the Rosenberger presentation to Sprint:

---

[2] The symbols' different blurriness levels is due to the source images' different resolutions.

—15—



The labels in the legends describe the data shown; for example, in the top Rosenberger entry, "HB" is for "high band," "P1" refers to the antenna's first port, "+45" indicates the antenna's polarization, "T0" indicates its tilt—and CAPAC is CommScope's acronym.

49.     For comparison, the first plot shown below was created with CommScope's Computational Software, and the plot on the bottom is from Rosenberger's presentation to Sprint:

—16—



REDACTED

50. The first plot below was created with CommScope's Computational Software, while the bottom plot is from another Rosenberger presentation:

—17—



# REDACTED

51.    And again, the first plot below was created with CommScope's Computational Software, while the bottom plot is from the same Rosenberger presentation. This pair of plots appears different than the prior examples because they are rectangular pattern plots, while the prior examples are rectangular plots of key performance indicators:

—18—





# REDACTED

—19—

52. The similarity in formatting is not a coincidence. The acronym "CAPAC" is unique to CommScope, and the Computational Software's choice of colors and label shapes is both arbitrary and baked into its source code.

53. In addition to Sprint, Rosenberger has also used the stolen Computational Software to prepare plots for BSA marketing materials it sent to T-Mobile, a key CommScope customer.

54. As is described in more detail below, Javier and Cameron are former CommScope employees who are now soliciting T-Mobile's BSA business for Rosenberger. Javier coordinated an effort to pitch T-Mobile on Rosenberger's BSAs with the help of Cameron and another former CommScope employee named Pamela Gallagher. As part of the pitch, Gallagher sent T-Mobile a specification sheet for the Rosenberger BSA.

55. The BSA specification sheet that Rosenberger sent T-Mobile was created using a stolen copy of CommScope's Computational Software. The specification sheet includes polar plots whose format is indistinguishable from the plots created by CommScope's Computational Software. A polar plot generated by the CommScope Computational Software is on the left and a Rosenberger plot from the specification sheet it sent to T-Mobile is on the right:



—20—

56.     The similarity in formatting is not a coincidence. The format of the Rosenberger polar plot exactly matches the 17 values that set the format of polar plots created by the Computational Software, all of which are fixed in its source code. Those 17 variables are shown below:



① **Angular Labels** – Font: Arial, Color: clBlack, Pen Style: psSolid, Position: Center, Range: -170 to 180, Steps: 10deg
② **Radial Labels** – Font: Arial, Color: clBlack, Pen Style: psSolid, Position: Center, Steps: 10deg
③ **Label Height** – Polar Graph Radius x 0.065
④ **Angular Label Radius** – Polar Graph Radius + 1.2 x Label Height
⑤ **Gridline** – Color: clSilver, Pen Style: psSolid
⑥ **Border** – Color: clGray, Pen Style: psSolid

57.     In addition to these specification sheets, it is likely that Rosenberger used the software to prepare other materials for T-Mobile. Rosenberger has conducted at least two field trials of its BSAs with T-Mobile. Wireless service providers typically require antennas to be approved for conducting field trials, and also typically require information about the antenna's performance along key metrics before approval. Rosenberger likely met those requirements by giving T-Mobile plots prepared with the Computational Software.

—21—

58.     In addition to Sprint and T-Mobile, Rosenberger has also likely prepared plots for AT&T—also a CommScope customer—using a misappropriated copy of the Computational Software.

59.     Rosenberger has obtained AT&T's approval to sell certain BSAs to AT&T. Rosenberger created the specification sheets for some of those BSAs using a stolen copy of CommScope's Computational Software. Like the specification sheet Rosenberger sent T-Mobile, the specification sheets for some of the AT&T-approved BSAs include polar plots whose format is indistinguishable from the plots created by CommScope's Computational Software. A polar plot generated by the CommScope Computational Software is on the left and a Rosenberger plot from the specification sheet for an AT&T-approved BSA is on the right:



**REDACTED**

60.     In addition, AT&T typically does not approve antennas without first receiving a package of plots, such as the Computational Software creates, validating the antenna's performance along key metrics. Rosenberger likely prepared those plots for AT&T using the stolen Computational Software.

61.     **The Trade Secret Simulation Software.** Rosenberger is also using CommScope's trade secret Simulation Software to develop BSAs.

—22—

62.     CommScope learned of Rosenberger's misappropriation of the Simulation Software from a Rosenberger employee. A Rosenberger China employee interviewed for a vacant role with CommScope. At the interview, a CommScope hiring manager asked a routine question about ways to simulate antenna patterns for optimal design. The Rosenberger employee responded that he did his day-to-day simulation work using "PSOAA," the Simulation Software—a CommScope proprietary program that only CommScope's employees can access. Rosenberger China obtained a copy of the Simulation Software from a departing CommScope employee and uses it to design antennas.

63.     Rosenberger employees in the United States also use the Simulation Software in their BSA design work, including at the Rosenberger New Jersey Offices.

### *Rosenberger's Misappropriation of CommScope's Trade Secret Hardware*

64.     CommScope lawfully acquired a Rosenberger BSA from a third-party distributor.

65.     The Rosenberger antenna is strikingly similar to CommScope's own designs. To illustrate the point, here is an image of a CommScope EGZV5 antenna:



Compared to an image of a Rosenberger BA-A7C7 J85W 8X65V-01 antenna[3]:

---

[3] One X-shaped element on this BSA has been removed.

—23—



66.    CommScope lawfully acquired another Rosenberger BSA from a third party. This Rosenberger BSA is approved for sale to AT&T, a CommScope customer. This Rosenberger antenna is also strikingly similar to CommScope's BSAs.

Here is the CommScope antenna:



And here is the Rosenberger antenna:



67.    In short, these Rosenberger antennas are knockoffs of CommScope antennas. And Rosenberger made them using CommScope's confidential and trade secret information, which was provided by former CommScope employees.

### IV.    The Individual Defendants' Breach of their Agreements with CommScope

*The Individual Defendants' Employment with CommScope*

68.    Javier joined Andrew Corp. in 2007. Andrew Corp. was a telecommunications company specializing in wireless equipment, which CommScope acquired later that year. Javier became a CommScope employee through the acquisition.

—24—

69.     On May 14, 2007, as a condition of employment with Andrew Corp., Javier

entered into an Employee's Confidentiality, Invention Assignment, and Non-Compete

Agreement with Andrew Corp. (the "Andrew Corp. Employment Agreement"), a true and

correct copy of which is attached hereto as **Exhibit 1**. This Agreement obligated Javier not to

solicit certain Andrew Corp. employees and customers for a year after her employment ended:

> G. Company Customers. Employee agrees that for twelve (12) months following
> termination of Employee's employment for any reason, Employee will not, directly or
> indirectly, solicit, call upon, contract with, sell to, or service, with respect to Conflicting
> Products any Company customer which Employee, directly or indirectly, solicited, called
> upon, contracted with, sold to, or serviced during his last twelve (12) months of
> employment by the Company. . . .

> I. Definition of Conflicting Products. "Conflicting Products" means products, processes,
> or services which are similar to, compete with, or can be used for the same purposes as
> products, processes or services sold or offered to be sold by, or in development at the
> Company, at any time during Employee's employment at the Company.

> J. Non-solicitation of the Company's Employees. During Employee's employment and
> for twelve (12) months following the termination of Employee's employment for any
> reason, Employee agrees that he will not, for himself or for any third-party, employ or
> seek to employ any person who is then employed by the Company. During this same
> period, Employee will not induce or attempt to influence any Company employee to
> terminate his or her employment or association with the Company.

> K. For one year after termination of employment for any reason, Employee will inform
> any prospective new employer of the existence of this Agreement.

70.     The Andrew Corp. Employment Agreement recognized that Javier would acquire

confidential information through her work for Andrew Corp., prohibited her disclosure of that

information, and required its return upon her departure:

> 1. Understandings. . . . C. As part of Employee's employment, the Company will provide
> Employee with information which is highly proprietary and confidential. Examples of
> such information include: customer and potential customer information; sales, marketing,
> and business plans, research and techniques; bid information; information on customer
> and potential customer buying habits and preferences; pricing and cost information;
> customer and potential customer specifications; supplier information; and information
> about product design, research, development and capabilities. Some of this information is
> highly secret, is not generally known outside of the Company, is valuable because of its

—25—

secrecy, and constitutes trade secrets under applicable law. This information belongs to the Company and is referred to in this Agreement as "Confidential Information." Confidential information may take the form of documents, be stored or transmitted electronically, or exist in spoken words only; what matters is the information itself, not the way in which it is stored or conveyed. . . . .

2. Employee's Obligations. A. Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.

B. Employee agrees to return to the Company at the time of the termination of his employment, all Company property in his possession, custody, or control, including but not limited to, all Confidential Information of the Company which exists in tangible form.

71.    The Andrew Corp. Employment Agreement further provided that it was "assignable by the Company [i.e., Andrew Corp., including its affiliates] without Employee's consent."

72.    CommScope's acquisition of Andrew Corp. closed on December 27, 2007. Andrew Corp. became a wholly-owned subsidiary of CommScope, giving CommScope the ability to enforce Andrew Corp.'s employment contracts.

73.    On November 2, 2010, Javier entered into an Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement with CommScope (the "CommScope Employment Agreement"), a true and correct copy of which is attached hereto as **Exhibit 2**. Around the same time, she was promoted into a new position as a Product Line Manager, a role that gave her a new title, new responsibilities, and accountability for one of CommScope's key customer relationships.

74.    This Agreement included a similar prohibition on the solicitation of certain customers and employees:

—26—

3. Non-Solicitation. Employee agrees that during his or her employment by the Company and for a period of one (1) year subsequent to the end of his or her employment relationship with the Company, regardless of reason for termination or separation or who initiates the ending of such employment relationship, Employee will not, without the prior written consent of the Company, either directly or indirectly:

> A. contact, solicit, divert, attempt to solicit, attempt to contact or attempt to divert business from any Customer for or on behalf of a Competitor (as defined below);

> B. solicit, divert, attempt to solicit or attempt to divert the employment of any other individual who is or has been an employee of the Company at any time within a period of twelve (12) months prior to the date of the end of his or her employment relationship with the Company;

> C. For the purposes of this Paragraph 3, "Competitor" shall mean any person, business or other entity that (i) provides services or products that do or can compete with or displace any service or products sold or being developed for sale by the Company during Employee's employment with the Company; or (ii) engages in any other business activities so similar in nature or purpose to those of the Company that they may or do displace business opportunities or customers of the Company; and

> D. For the purposes of this Paragraph 3, "Customer" shall be limited to any customer of the Company that Employee personally solicited, serviced, had management responsibilities for, or had substantive contact with on behalf of the Company during the last twelve (12) months of his or her employment with the Company.

75.    The CommScope Employment Agreement recognized that Javier "may, during the course of [her] employment with the Company, be given access to Confidential Information," and that "it would be improper and inequitable for [Javier] to use Confidential Information for any purpose other than to benefit the Company or to disclose such Confidential Information to anyone outside of the Company, either during or subsequent to [her] employment with the Company, without the Company's approval."

76.    Accordingly, the CommScope Employment Agreement, like the Andrew Employment Agreement, prohibited her disclosure of confidential information and required its return upon her departure:

—27—

1. Confidentiality. As part of Employee's employment, the Employee may be provided, become aware of or develop information that is proprietary and/or confidential, including, but not limited to: customer and potential customer information; sales, marketing and business plans; research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing, profit and cost information; customer and potential customer specifications; supplier information; Inventions (as defined above); and information about product design, research, development and capabilities. Some of this information is highly secret, is not generally known outside of the Company, is valuable because of its secrecy and constitutes trade secrets under applicable law. The types of information identified in this paragraph belong to the Company and are referred to in this Agreement as "Confidential Information." Confidential Information may take the form of documents, be stored or transmitted electronically or exist in spoken words only.

A. Both during Employee's employment relationship with the Company and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company, or to a Company Officer, or to a third party if approved in writing prior to such use or disclosure by an authorized Officer of the Company.

B. Employee agrees to return to the Company at the end of his or her employment relationship with the Company, all Company property in his or her possession, custody or control. including, but not limited to, all Confidential Information that exists in tangible or electronic form. Employee also agrees that upon the end of his or her employment relationship with the Company or in anticipation of or subsequent to such separation, he or she will not delete, move offsite or destroy any Company property, regardless of form without the express consent of the Company. . . .

D. Upon request by the Company, Employee shall promptly provide to, and hereby agrees to allow the Company to inspect, his or her personal computer(s), hard drive(s) and/or other electronic storage medium or equipment upon which he or she has stored or transmitted Confidential Information in order to confirm that all Confidential Information has been removed or electronically destroyed. In the event that all of the Confidential Information has not been destroyed, Employee agrees that the Company is authorized to erase. destroy or remove such Confidential Information, or retain possession of the personal computer(s), electronic storage medium or equipment (other than the Employee's personal files and programs) and provide Employee with a substitutes [sic] of substantially the same value, without further payment or authorization and regardless of where the computer(s), electronic storage medium or equipment is located. . . .

F. The obligations set forth in this Paragraph shall be without time or geographic limitation and shall survive and be enforceable after Employee's employment

—28—

relationship with the Company ends so long as the information in question continues to be Confidential Information. Confidential Information will no longer be considered confidential after a date on which the Employee can substantiate, as established by independent documentary proof, that the subject information: (a) has become publicly known through no wrongful act of the Employee, or (b) is approved for release or disclosure by prior written authorization of an authorized Officer of the Company. In the alternative, and only in the event a court of competent jurisdiction determines that this provision must contain a time limitation in order to be enforceable, the applicable time limitation shall be four (4) years from the Employee's last day of employment with the Company.

77.     The CommScope Employment Agreement provided that Javier "consents to the exclusive jurisdiction and venue of the state and federal courts of Catawba County in North Carolina to hear and resolve disputes arising under this Agreement."

78.     The Agreement further provided that "[t]he substantive laws of the state of North Carolina, excluding its conflicts of law rules, shall govern this Agreement."

79.     Javier resigned from CommScope on August 3, 2018. At the time of her resignation, she was CommScope's Key Account Manager for T-Mobile, one of CommScope's most significant customers.

80.     Javier reaffirmed the Agreement in her exit paperwork. She signed an Employee Exit Statement, a true and correct copy of which is attached hereto as **Exhibit 3**. In the exit statement, she acknowledged that she had been given a copy of her CommScope Employment Agreement and agreed that she understood that her confidentiality obligations continued after her termination.

81.     Cameron joined Andrew in 1999, where he had obligations of confidentiality. On November 9, 2010, Cameron agreed to a CommScope Employment Agreement, a true and correct copy of which is attached hereto as **Exhibit 4**. His agreement has identical terms to Javier's agreement.

—29—

82. Cameron departed from CommScope on January 18, 2019. At the time of his departure, he was an Applications Engineer. In that role, he provided field support to a wide range of CommScope customers, including T-Mobile, when they had technical issues.

83. Upon his separation, Cameron signed a Separation and Release Agreement, a true and correct copy of which is attached hereto as **Exhibit 5**. In that Agreement, he recognized that he'd had access to confidential CommScope information and agreed not to disclose it without written authorization from CommScope:

> You acknowledge that as a result of your employment with Company, you have had access to confidential and proprietary business information of Company, including, but not limited to, insured claims and other insurance matters, personnel information, product information, vendor and supplier information, business decisions, plans and strategies, research and development activities, manufacturing and marketing techniques, technological and engineering data, processes and inventions, legal matters affecting Company and Company's business, customer and prospective customer information, trade secrets, bid prices, contractual terms and arrangements, prospective business transactions, joint ventures, pricing strategies, and financial and business forecasts ("Confidential Information"). Confidential Information also includes information, knowledge or data of any third party doing business with Company that the third party has identified as being confidential. You agree not to use or to disclose to anyone any Confidential Information at any time in the future without the prior written authorization of Company.

84. The Separation and Release Agreement further provided that "[t]his Agreement will be construed and enforced in accordance with North Carolina state law, excluding its conflict of law rules," and that Cameron and CommScope "agree to submit to personal jurisdiction in the state of North Carolina and to venue in its courts."

### *Javier and Cameron Solicit T-Mobile's Antenna Business for Rosenberger*

85. Javier and Cameron now work for Rosenberger. They are both working to sell BSAs to T-Mobile in violation of their legal obligations to CommScope.

86. In April 2019, Javier worked with T-Mobile to coordinate a field trial of a Rosenberger BSA at 148 Madison Street, New York, New York. In this trial, Rosenberger and

—30—

T-Mobile deployed a Rosenberger BSA into T-Mobile's wireless network, where it provided a signal to T-Mobile customers in New York City.

87. Coordinating field trials for T-Mobile was a key part of Javier's responsibilities while she was at CommScope. Javier is now performing these same tasks for Rosenberger, and working with many of the same T-Mobile employees that she worked with while at CommScope. Javier was T-Mobile's primary point of contact at Rosenberger for the trial. She sent four Rosenberger BSAs, unit number 2F4WC-21, to New Jersey for the trial, where T-Mobile received them from the Rosenberger Asia Office. She also arranged for Rosenberger engineer Pamela Gallagher—another former CommScope employee who worked on field trials while at CommScope—to be on-site the day of the trial. Gallagher sent T-Mobile specifications for the Rosenberger antenna in the lead-up to the trial. As is described above, the specifications included polar plots that were created using Rosenberger's stolen version of CommScope's Computational Software.

88. Cameron was also involved in Rosenberger's pitch to T-Mobile. Gallagher included both Javier and Cameron when she sent T-Mobile the specifications for the antenna. Javier also added Cameron to discussions of logistics for the trial. As a former CommScope engineer, Cameron was involved in the technical aspects of the trial for T-Mobile.

89. In the same timeframe, Javier set up a trial of the same antenna for T-Mobile in Los Angeles. Gallagher also assisted with that trial.

90. CommScope learned of Javier's work on the T-Mobile antenna trial when T-Mobile employees working on the trial emailed Javier's CommScope email address—an understandable action, since she had until recently been pitching those same T-Mobile employees on CommScope's behalf.

—31—

### *Javier Solicits CommScope Employees*

91.     Additionally, Javier is actively soliciting CommScope employees for employment with Rosenberger. She approached current CommScope employee Ray Butler about joining Rosenberger in or around June 2019. In late 2018 she also approached another CommScope executive involved in working with T-Mobile.

### *Javier and Cameron Violate their Non-Disclosure Agreements*

92.     As part of her work for CommScope, Javier had access to CommScope confidential information including, but not limited to, CommScope's sales, marketing and business plans; customer and potential customer information; information on customer and potential customer buying habits and preferences; customer and potential customer specifications; pricing information; and information about product design, research, development and capabilities, including CommScope's planned technical roadmaps for new product development, technical specifications for products CommScope has not yet released, and confidential technical information regarding the design and functioning of its BSA products. Javier also had access to an extensive network of customer contacts and relationships built by CommScope employees over the course of years. She is now using the confidential information and relationships she gained while at CommScope to benefit Rosenberger and has shared confidential CommScope information with Rosenberger.

93.     As part of his work for CommScope, Cameron had access to CommScope confidential information including, but not limited to, customer information; information on customer buying habits and preferences; customer specifications; cost information; and information about product design, research, development and capabilities, including confidential technical information regarding the design and functioning of CommScope's BSA products. He

—32—

is now using the confidential information he gained while at CommScope to benefit Rosenberger and has shared confidential CommScope information with Rosenberger.

### *Rosenberger's Knowledge of Javier and Cameron's Employment Agreements*

94.     Through its previous hiring or attempts to hire several other CommScope employees, Rosenberger has knowledge or should have knowledge of the employment agreements that CommScope requires its employees to sign and the promises contained therein. Rosenberger nevertheless recruited and hired Javier and Cameron, despite knowing that their employment by Rosenberger in a role that involved soliciting T-Mobile would breach their post-employment obligations to CommScope. Rosenberger also permitted Javier to solicit current CommScope employees.

95.     Javier has knowledge or should have knowledge of the terms of CommScope's employment agreements with Cameron because she herself is subject to the same terms. She nevertheless involved Cameron in soliciting T-Mobile, despite knowing that it would breach his post-employment obligations to CommScope.

96.     Rosenberger Asia, the Rosenberger Asia Office, Rosenberger China, and Rosenberger Germany are involved in Javier and Cameron's efforts to sell Rosenberger antennas in the United States. While both Javier and Cameron work in the United States selling to companies in the United States, they report to Rosenberger Asia, which is the parent company of Rosenberger China and the Rosenberger Asia Office. Additionally, the specifications for the T-Mobile antenna used in the New York trial for T-Mobile include the names of both Rosenberger Germany and Rosenberger Asia, and the antennas themselves were picked up from the Rosenberger Asia Office at Javier's request.

—33—

## COUNT I
## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. 1836(b)
### (Against All Defendants)

97.     CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

98.     CommScope possesses confidential information and trade secrets related to its BSA business including, but not limited to, the BSA Trade Secrets.

99.     Defendants have acquired and have used or are planning to use CommScope's BSA Trade Secrets under circumstances in which they knew or had reason to know that the BSA Trade Secrets were obtained without authorization.

100.    The Rosenberger Defendants have obtained CommScope's BSA Trade Secrets by hiring CommScope employees on the understanding they would misappropriate CommScope BSA Trade Secrets without CommScope's authorization and provide the BSA Trade Secrets to the Rosenberger Defendants.

101.    The Individual Defendants have obtained CommScope's BSA Trade Secrets and are now using materials created with the BSA Trade Secrets to sell Rosenberger BSAs.

102.    CommScope's BSA Trade Secrets are related to products or services used in, or intended for use in, interstate or foreign commerce.

103.    CommScope has taken reasonable steps to maintain the confidential nature of its BSA Trade Secrets, including but not limited to the BSA Trade Secrets that the Rosenberger Defendants have misappropriated.

104.    CommScope's BSA Trade Secrets are nonpublic and confidential, are not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

—34—

105. CommScope's BSA Trade Secrets derive actual and potential independent economic value from not being generally known to, or readily ascertainable through proper means by, other persons who might obtain economic value from their disclosure or use.

106. Defendants possess CommScope's BSA Trade Secrets without any color of right.

107. Defendants' actions in misappropriating CommScope's BSA Trade Secrets were done willfully and maliciously.

108. Defendants' actions violate the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, et seq.

109. Defendants' misappropriation of CommScope's BSA Trade Secrets has caused and will cause CommScope damages in an amount to be determined at trial.

110. In addition, CommScope will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent Defendants' misappropriation and threatened further misappropriation, and to prevent the value of CommScope's BSA Trade Secrets from continuing to inure unfairly to Defendants' benefit.

**COUNT II**
**VIOLATION OF THE NORTH CAROLINA TRADE SECRETS PROTECTION ACT,**
**N.C. Gen. Stat. § 66-153**
**(Against All Defendants)**

111. CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

112. CommScope possesses BSA Trade Secrets related to its BSA business, as described above. CommScope's BSA Trade Secrets constitute trade secrets within the meaning of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152 et seq.

113. Defendants have acquired and have used or are planning to use CommScope's BSA Trade Secrets under circumstances in which they knew or had reason to know that the BSA

—35—

Trade Secrets were obtained without express or implied authority or consent and were not obtained by proper means.

114. CommScope has taken reasonable steps to maintain the confidential nature of its Trade Secrets, including but not limited to the BSA Trade Secrets that Defendants have misappropriated and/or will misappropriate.

115. CommScope's BSA Trade Secrets are nonpublic and confidential, are not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

116. CommScope's BSA Trade Secrets derive actual and potential independent commercial value from not being generally known to, or readily ascertainable through proper means by, other persons who might obtain economic value from their disclosure or use.

117. Defendants' actions in misappropriating CommScope's BSA Trade Secrets were done willfully and maliciously.

118. Defendants' actions violate the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152 et seq.

119. Defendants' misappropriation of CommScope's BSA Trade Secrets has caused and will cause CommScope damages in an amount to be determined at trial.

120. In addition, CommScope will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent Defendants' misappropriation and threatened further misappropriation, and to prevent the value of CommScope's BSA Trade Secrets from continuing to inure unfairly to Defendants' benefit.

—36—

## COUNT III
## BREACH OF CONTRACT
### (Against the Individual Defendants)

121.    CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

122.    Defendant Javier agreed to the Andrew Corp. Employment Agreement and the CommScope Employment Agreement, and Defendant Cameron agreed to the CommScope Employment Agreement (the "Employment Agreements"), true and correct copies of which are attached hereto as Exhibits 1, 2 and 4.

123.    Cameron additionally agreed to the Separation and Release Agreement (together with the Employment Agreements, the "Agreements"), a true and correct copy of which is attached hereto as Exhibit 5.

124.    Under their terms, the CommScope Employment Agreement and the Separation and Release Agreement are to be construed according to the laws of the State of North Carolina.

125.    For a period of one year following the end of the Individual Defendants' employment relationship with CommScope, the Employment Agreements prohibit Javier and Cameron from, on behalf of a competitor, directly or indirectly soliciting any CommScope customer that he or she personally solicited or serviced on behalf of CommScope during the last twelve months of his or her employment with CommScope.

126.    The Agreements were supported by adequate consideration and are enforceable.

127.    CommScope has fully complied with all of its obligations under the Agreements.

128.    Javier personally solicited T-Mobile during the year prior to the end of her employment relationship with CommScope.

129.     Javier's efforts to sell BSAs to T-Mobile violate her obligations under the Employment Agreements not to solicit CommScope customers on behalf of a competitor for a period of one year following the end of her employment relationship with CommScope.

130.     Javier has solicited at least one CommScope employee about joining Rosenberger, in violation of her obligations under the Employment Agreements.

131.     Cameron personally serviced and/or had substantive contact with T-Mobile during the year prior to the end of his employment relationship with CommScope.

132.     Cameron assisted with Rosenberger and Javier's efforts to sell BSAs to T-Mobile. This violated his obligation under the Employment Agreements not to solicit CommScope customers on behalf of a competitor for a period of one year following the end of his employment relationship with CommScope.

133.     Both Javier and Cameron have used and are using CommScope confidential information to benefit Rosenberger and have shared confidential CommScope information with Rosenberger, in violation of their Agreements.

134.     CommScope has and will continue to suffer damages as a result of both Javier and Cameron's breach in an amount to be determined at trial.

135.     Further, CommScope has and will continue to suffer irreparable harm absent injunctive relief. The Employment Agreements specifically contemplate and expressly authorize such injunctive relief.

136.     In addition, the Employment Agreements expressly provide that in the event CommScope prevails in legal action to enforce any part of them, it is entitled to its reasonable costs and attorneys' fees.

—38—

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against the Rosenberger Defendants and Javier)

137. CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

138. The Rosenberger Defendants knew or should have known about the Agreements between CommScope and Javier, and between CommScope and Cameron.

139. Javier knew or should have known about the Agreements between CommScope and Cameron.

140. Javier and Cameron's Agreements were supported by adequate consideration and are enforceable.

141. The Rosenberger Defendants have interfered with, and if not enjoined will continue to interfere with, Javier and Cameron's obligations to CommScope as set forth in their Agreements.

142. Javier has interfered with, and if not enjoined will continue to interfere with, Cameron's obligations to CommScope as set forth in his Agreements.

143. The Rosenberger Defendants intended to harm CommScope by interfering with Javier and Cameron's contractual obligations to CommScope. The Rosenberger Defendants intentionally procured the breach of those contractual obligations by recruiting and hiring Javier and Cameron to work in roles where they would solicit CommScope customers with whom they had substantive contact during the year prior to the end of their employment relationship with CommScope, and in which they would share confidential CommScope information with Rosenberger and use it for Rosenberger's benefit, in direct contravention of the non-solicitation and non-disclosure obligations in their Agreements.

—39—

144.     The Rosenberger Defendants' interference was and is improper and without justification or privilege. The Rosenberger Defendants interfered with Javier and Cameron's contractual obligations with the intent of injuring CommScope and improperly gaining a competitive advantage at CommScope's expense. The Rosenberger Defendants have repeatedly targeted CommScope employees, both in China and in the United States. They have attracted CommScope employees by paying above-market wages meant to induce the employees to breach their obligations to CommScope. And the Rosenberger Defendants continue to use confidential CommScope information obtained from former CommScope employees, such as a stolen copy of CommScope's Computational Software, when using Javier and Cameron to compete for CommScope customers in violation of their contracts.

145.     Javier intended to harm CommScope by interfering with Cameron's contractual obligations to CommScope. She intentionally procured the breach of those contractual obligations by involving Cameron in soliciting a CommScope customer with whom he had substantive contact during the year prior to the end of his employment relationship with CommScope, and in sharing confidential CommScope information with Rosenberger and using it for Rosenberger's benefit, in direct contravention of the non-solicitation and non-disclosure obligations in his Agreements.

146.     Javier's interference was and is improper and without justification or privilege. Javier interfered with Cameron's contractual obligations, with the intent of injuring CommScope and improperly gaining a competitive advantage at CommScope's expense. Javier continues to interfere with CommScope employees' contracts, in violation of her non-solicitation obligations. She also continues to involve Cameron in using materials prepared with a stolen copy of

CommScope's Computational Software to unfairly attract CommScope customers to Rosenberger, in violation of their non-solicitation obligations.

147.    As a direct and proximate result of the Rosenberger Defendants' and Javier's tortious interference with contract, CommScope has been damaged in an amount to be determined at trial. In addition, CommScope has suffered irreparable harm and will continue to suffer irreparable harm unless CommScope's conduct is enjoined by this Court.

**COUNT V**
**UNFAIR COMPETITION IN VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. Gen. Stat. § 75-16**
**(Against All Defendants)**

148.    CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

149.    Defendants' misappropriation of CommScope's BSA Trade Secrets, as described above, constitutes an unfair method of competition in violation of the Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

150.    The Rosenberger Defendants' tortious interference with Javier and Cameron's Agreements, and Javier's interference with Cameron's Agreements, as described above, constitutes an unfair method of competition in violation of the Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

151.    Defendants' actions, as alleged herein, also violated the Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, because the actions were unfair under all of the facts and circumstances, in that Defendants acted in bad faith, inequitably, and in a manner that undermines the ethical standards and good faith dealings between parties engaged in competition.

152.    Defendants' unfair methods of competition affected commerce.

—41—

153. As a direct and proximate result of Defendants' unfair methods of competition, CommScope was harmed in its competition with the Rosenberger Defendants in the sale of BSAs.

154. Defendants' actions in misappropriating CommScope's BSA Trade Secrets, and in tortiously interfering with Javier and Cameron's CommScope Employment Agreements, were done willfully.

155. As a direct and proximate result of Defendants' unfair methods of competition, CommScope has been damaged in an amount to be determined at trial.

**COUNT VI**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

156. CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

157. Under North Carolina law, a civil conspiracy requires an agreement between two or more persons to commit a wrongful act; an act in furtherance of the agreement; and damage to the plaintiff as a result.

158. The Rosenberger Defendants and the Individual Defendants have agreed to unlawfully harm CommScope in its ability to compete with Rosenberger by misappropriating CommScope's trade secrets and interfering with CommScope's employment contracts. Javier and Cameron each reached this agreement with the Rosenberger Defendants while they were employed by CommScope. Defendants' actions undertaken in furtherance of the agreement include, but are not limited to, the Rosenberger Defendants' employment of the Individual Defendants in violation of their Agreements with CommScope, the Rosenberger Defendants' use of CommScope trade secrets and confidential information to create and sell BSAs, and

—42—

Rosenberger North Carolina's sale in North Carolina of components that are compatible with Rosenberger antennas incorporating CommScope trade secrets. As a direct and proximate result of these actions, CommScope has been damaged in an amount to be determined at trial.

**WHEREFORE,** CommScope prays for the following relief:

1.  An Order granting preliminary and permanent injunctive relief preventing the Rosenberger Defendants and all of their respective agents, servants, officers, directors, employees, and all others holding by or through the Rosenberger Defendants, or controlling the Rosenberger Defendants or controlled by the Rosenberger Defendants, or in active concert or participation with the Rosenberger Defendants, from engaging in and continuing to benefit from the wrongful conduct described herein, and eliminating the Rosenberger Defendants' inequitable advantages arising from the wrongful conduct;

2.  An Order requiring the Rosenberger Defendants and all of their respective agents, servants, officers, directors, employees, and all others holding by or through the Rosenberger Defendants, or controlling the Rosenberger Defendants or controlled by the Rosenberger Defendants, or in active concert or participation with the Rosenberger Defendants, to deliver to CommScope all materials embodying, deriving from, or otherwise revealing CommScope's trade secrets;

3.  An Order granting preliminary and permanent injunctive relief preventing the Individual Defendants from engaging in the wrongful conduct described herein and equitably extending their contractual obligations so that they do not unfairly benefit from the period during which they were not in compliance;

—43—

4. Awarding CommScope damages for the breaches, statutory violations, and tortious conduct described herein, including treble damages under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-16;

5. Awarding CommScope damages for any unjust enrichment caused by the Rosenberger Defendants' misappropriation of trade secrets that is not addressed in computing damages for actual losses to CommScope;

6. Awarding CommScope exemplary damages under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3), in an amount two (2) times the amount of the combined actual and unjust enrichment damages;

7. Awarding CommScope punitive damages under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-154(c);

8. Awarding CommScope punitive damages for the Rosenberger Defendants' torts;

9. Awarding CommScope interest, reasonable attorneys' fees, and costs available under the law, including but not limited to under N.C. Gen. Stat. § 75-16.1;

10. Setting for trial by jury all issues that are triable; and

11. Awarding CommScope such other, further, or different relief as the Court deems just and proper.

This 23rd day of July, 2019.

Pearlynn G. Houck
N.C. Bar No. 36364
phouck@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Ste. 1900
Charlotte, North Carolina 28246
Telephone:     704.377.2536
Facsimile:      704.378.4000

—44—

Randall E. Kahnke*
randall.kahnke@FaegreBD.com
Tyler A. Young*
tyler.young@FaegreBD.com
Anna E. Sallstrom*
anna.sallstrom@FaegreBD.com
* *Pro Hac Vice* motions to be filed.

FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone:     612.766.7614
Facsimile:     612.766.1600

***Attorneys for Plaintiff***

# EXHIBIT 1



## Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement

_Janet Javier_ ("Employee") hereby agrees with ANDREW CORPORATION, including its subsidiaries, division, and affiliates, ("Company") as follows:

**1. Understandings**

A. Employee desires to work for or to continue to work for the Company and the Company desires to employ or to continue to employ Employee.

B. In consideration and in exchange for my employment, continued employment, training, benefits, options, bonus, commissions, the provision of trade secrets, the provision of confidential information and/or the payment of wages to me by the Company during my employment, I agree as follows:

C. As part of Employee's employment, the Company will provide Employee with information which is highly proprietary and confidential. Examples of such information include: customer and potential customer information; sales, marketing, and business plans, research, and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; customer and potential customer specifications; supplier information; and information about product design, research, development, and capabilities. Some of this information is highly secret, is not generally known outside of the Company, is valuable because of its secrecy, and constitutes trade secrets under applicable law. This information belongs to the Company and is referred to in this Agreement as "Confidential information." Confidential information may take the form of documents, be stored or transmitted electronically, or exist in spoken words only; what matters is the information itself, not the way in which it is stored or conveyed.

D. All ideas, creations, inventions, improvements, discoveries, and writings (hereinafter collectively referred to as "Inventions") made or conceived by Employee during his/her employment with the Company, and during the twelve-month period thereafter to the extent they relate to research and development carried on by the Company during Employee's employment, will be and shall be the sole and exclusive property of the Company.

E. The Company has already invested and will continue to invest substantial time and money in developing the resources and environment for Employee to perform his/her job on behalf of the Company. In addition, the Company has developed a base of customers or potential customers. Employee will be exposed to or introduced to the Company's customer or potential customer relationships solely for the benefit of the Company and the development, promotion, and sale of the Company's products.

F. It would be inequitable for the Company to spend the time and money to train Employee, to expose Employee to its business and to its proprietary and Confidential Information, and to introduce Employee to its customers or potential customers without the assurance that Employee will refrain from competing against the Company upon his/her termination from employment, as set forth in paragraphs 2G, 2H and/or 2I.

G. Employee has read this Agreement and understands the obligations and restrictions it contains.

H. Employee is being given employment or continued employment in consideration for accepting and binding himself/herself to this Agreement. Employee's acceptance of this Agreement is crucial to the Company and the Company would not employ or continue to employ Employee if he/she did not sign this Agreement.

I. Any breach of Employee's undertakings in this Agreement will cause irreparable harm to the Company for which the Company may not be able to be sufficiently compensated in money damages.

**2. Employee's Obligations**

A. Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.

B. Employee agrees to return to the Company at the time of the termination of his employment, all Company property in his possession, custody, or control, including but not limited to, all Confidential information of the Company which exists in tangible form.

C. Employee will identify promptly in writing to the Company all Inventions, whether or not patentable or copyrightable, made or conceived by Employee, either alone or with others, during his/her employment with the Company, and during the twelve-month period thereafter.

D. Employee will maintain complete records of all Employee's creative or inventive activities and will deliver such records to the Company at the termination of his/her employment or as requested by the Company. Employee also agrees to surrender to the Company upon termination of his/her employment all materials and things belonging to the Company, including, but not limited to, manuals, drawings, software, notes, photographs, and other documents, and all copies thereof.

E. All Inventions shall be the sole and exclusive property of the Company. Employee will assist the Company in every way (at the Company's expense), both during Employee's employment and thereafter, to obtain and enforce the Company's rights to the Inventions in the United States and in any other country. Employee will, at the Company's request, both during Employee's employment and thereafter, execute all assignments of rights and other documents necessary to ensure and perfect the Company's rights in such inventions and to obtain patents, copyrights, and any other form of legal protection. This provision does not apply to any inventions for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time unless (i) the invention relates [a] to the business of the Company, or [b] to the Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for the Company.

F. Employee warrants that the attached Exhibit A° is a complete description of all creations, inventions, and discoveries excluded from this Agreement which Employee made prior to his/her employment by the Company.

G. Company Customer. Employee agrees that for twelve (12) months following termination of Employee's employment for any reason, Employee will not, directly or indirectly, solicit, call upon, contract with, sell to, or service, with respect to Conflicting Products any Company customer whom Employee, directly or indirectly, solicited, called upon, contracted with, sold to, or serviced during his last twelve (12) months of employment by the Company.

H. Company Products. Employee agrees that for twelve (12) months following termination of Employee's employment for any reason, Employee will not participate in the development or support of Conflicting Products, of the type on which Employee worked during his last twelve (12) months of employment by Company, in the same geographic area(s) in which the Company markets and sells products, processes, or services.

I. Definition of Conflicting Products. "Conflicting Products" means products, processes, or services which are similar to, compete with, or can be used for the same purposes as products, processes or services sold or offered to be sold by, or in development at the Company, at any time during Employee 's employment at the Company.

J. Non-solicitation of the Company's Employees. During Employee's employment and for twelve (12) months following the termination of Employee's employment for any reason, Employee agrees that he will not, for himself or for any third-party, employ or seek to employ any person who is then employed by the Company. During this same period, Employee will not induce or attempt to influence any Company

Standard Ver. 1 2004

employee to terminate his or her employment or association with the Company.

K. For one year after termination of employment for any reason, Employee will inform any prospective new employer of the existence of this Agreement.

### 3. General Provisions

A. The terms of this Agreement are severable and the Company may enforce any provision without waiver of any other provision. The invalidity or nonenforceability of any one or more provisions will not affect whether any other provision is enforceable.

B. In the event that any provision of this Agreement is determined to be unenforceable, the court or other deciding authority is expressly authorized to conform the provision to the extent necessary to remedy any deficiency and render it valid and enforceable.

C. Except as set forth in paragraph 3B, no provision of this Agreement may be modified, waived, or discharged by the parties unless such modification, waiver, or discharge is agreed to, in writing, and signed by Employee and by an authorized officer of the Company, or by the respective parties' legal representatives and successors.

D. Employee acknowledges that his obligations under this Agreement are in addition to any and all obligations concerning the same subject matter arising under applicable law including, without limitation, common law relating to fiduciary duties and common law and statutory law relating to trade secrets.

E. Neither this Agreement nor any benefits hereunder are assignable by Employee, but the terms and provisions hereof are assignable by the Company without Employee's consent.

F. The laws of the state of Illinois shall govern this Agreement.

G. Employee consents to the exclusive jurisdiction and venue of the state and federal courts of Cook County in Illinois to hear and resolve disputes arising under this Agreement.

H. In the event of a breach or a threatened breach of this Agreement, by the Employee, Employee acknowledges that the Company will face irreparable injury which may be difficult to calculate in dollar terms and that the Company shall be entitled, in addition to remedies otherwise available at law or in equity, to temporary restraining orders and preliminary injunctions and final injunctions enjoining such breach or threatened breach. In the event the Company shall successfully enforce any part of this Agreement through legal proceedings, Employee agrees to pay the Company all costs and attorneys' fees reasonably incurred by the Company in connection therewith.

I. Employee's employment with the Company is at-will, meaning that Employee's employment may be terminated by the Company or by Employee at any time without cause. This Agreement is not a contract of employment for any duration and nothing herein changes or affects in any way Employee's at-will status.

J. This Agreement constitutes the entire Agreement between the Company and Employee with respect to the subject matter herein and supersedes all prior agreements or understandings with respect to the subject matter herein.

ANDREW CORPORATION

By: _____

Title: _HR Manager_____

EMPLOYEE _____

Date: _5/14/2007_____

*Attach Exhibit A if Employee has pre-existing inventions to disclose.*

2

Standard Ver. 1 2004

# EXHIBIT 2



## EMPLOYEE CONFIDENTIALITY, INVENTION
## ASSIGNMENT AND NON-SOLICITATION AGREEMENT

This Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement ("Agreement") by and between _Janet Lawyer_ (the "Employee") and CommScope, Inc. of North Carolina, (the "Company"), is entered into this _2_ day of _November_ 20_10_.

**WHEREAS**, Employee desires to work for and the Company desires to hire Employee on an "at will" basis; and

**WHEREAS**, Employee may, during the course of his or her employment with the Company, be given access to Confidential Information (as defined below); and

**WHEREAS**, it would be improper and inequitable for Employee to use Confidential Information for any purpose other than to benefit the Company or to disclose such Confidential Information to anyone outside of the Company, either during or subsequent to his or her employment with the Company, without the Company's approval; and

**WHEREAS**, Employee may alone or with others develop ideas, creations, inventions (patentable or not), improvements, discoveries, processes, products, devices or designs and works of authorship, whether copyrightable or not, including software and writings (hereinafter collectively referred to as "Inventions") during his or her employment and arising from or related to his or her employment; and

**WHEREAS**, both Employee and the Company agree that such Inventions are the sole property of the Company; and

**WHEREAS**, the Company has already invested and will continue to invest substantial time and money in developing the resources and environment for Employee to perform his or her job on behalf of the Company and has developed a base of customers or potential customers that Employee may be exposed to or introduced to by the Company solely for the benefit of the Company and the development, promotion and sale of the Company's products and services; and

**WHEREAS**, both Employee and the Company agree that Employee's use of Confidential Information is only for the benefit of the Company and that the Company's willingness to spend the time and money to train Employee, to expose Employee to its business and to its Confidential Information and to introduce Employee to its customers or potential customers is based on the assurances provided herein that Employee will refrain from soliciting either the employees or customers of the Company for a reasonable period of time at the end of his or her employment relationship with the Company.

**NOW, THEREFORE**, both Employee and the Company mutually agree as follows:

Case 5:19-cv-00009-KDB-DCK Document 24-1 Filed 04/06/20 Page 51 of 73



1.    Confidentiality.   As part of Employee's employment, the Employee may be
provided, become aware of or develop information that is proprietary and/or confidential,
including, but not limited to:   customer and potential customer information; sales,
marketing and business plans; research and techniques; bid information; information on
customer and potential customer buying habits and preferences; pricing, profit and cost
information; customer and potential customer specifications; supplier information;
Inventions (as defined above); and information about product design, research,
development and capabilities.  Some of this information is highly secret, is not generally
known outside of the Company, is valuable because of its secrecy and constitutes trade
secrets under applicable law.   The types of information identified in this paragraph
belong to the Company and are referred to in this Agreement as "Confidential
Information."  Confidential Information may take the form of documents, be stored or
transmitted electronically or exist in spoken words only.

A.    Both during Employee's employment relationship with the Company and
thereafter, Employee will hold in strictest confidence and will not use or disclose
to anyone any Confidential Information, including any such Confidential
Information developed by Employee, except as such disclosure or use may
reasonably be required in connection with Employee's work for the Company, or
to a Company Officer, or to a third party if approved in writing prior to such use or
disclosure by an authorized Officer of the Company.

B.    Employee agrees to return to the Company at the end of his or her
employment relationship with the Company, all Company property in his or her
possession, custody or control, including, but not limited to, all Confidential
Information that exists in tangible or electronic form.  Employee also agrees that
upon the end of his or her employment relationship with the Company or in
anticipation of or subsequent to such separation, he or she will not delete, move
offsite or destroy any Company property, regardless of form without the express
consent of the Company.

C.    Employee shall return any Company-provided computer to the Company
without deleting any information or programs thereon, otherwise disabling any
operating system or corrupting or otherwise affecting the operation of, or the
Company's ability to retrieve information from, the computer.

D.    Upon request by the Company, Employee shall promptly provide to, and
hereby agrees to allow the Company to inspect, his or her personal computer(s),
hard drive(s) and/or other electronic storage medium or equipment upon which
he or she has stored or transmitted Confidential Information in order to confirm
that all Confidential Information has been removed or electronically destroyed.  In
the event that all of the Confidential Information has not been destroyed,
Employee agrees that the Company is authorized to erase, destroy or remove
such Confidential Information, or retain possession of the personal computer(s),
electronic storage medium or equipment (other than the Employee's personal
files and programs) and provide Employee with a substitutes of substantially the

Page 2 of 6



same value, without further payment or authorization and regardless of where the computer(s), electronic storage medium or equipment is located.

E.     Employee agrees that he or she will not use or disclose to Company, its employees, agent or subcontractors any trade secret or confidential information of any third party, including any former employer, during his or her employment with the Company that he or she does not have the legal right to disclose. In case of doubt with respect to his or her obligations towards a prior employer, Employee shall consult with the Company.

F.     The obligations set forth in this Paragraph shall be without time or geographic limitation and shall survive and be enforceable after Employee's employment relationship with the Company ends so long as the information in question continues to be Confidential Information. Confidential Information will no longer be considered confidential after a date on which the Employee can substantiate, as established by independent documentary proof, that the subject information: (a) has become publicly known through no wrongful act of the Employee, or (b) is approved for release or disclosure by prior written authorization of an authorized Officer of the Company. In the alternative, and only in the event a court of competent jurisdiction determines that this provision must contain a time limitation in order to be enforceable, the applicable time limitation shall be four (4) years from the Employee's last day of employment with the Company.

2.     Inventions. Employee agrees to grant, and hereby does grant and assign to the Company, all rights and title to all Inventions (including, but not limited to all rights and title to any patent, patent application, copyright or copyright application related thereto) made or conceived by Employee during his or her employment with the Company, and during the twelve-month period thereafter to the extent they relate to research and development carried on by the Company during Employee's employment. All such Inventions, including Inventions conceived after the execution date of this Agreement, are hereby assigned to the Company and are the sole and exclusive property of the Company. This provision does not apply to any inventions made by Employee for which no Confidential Information or equipment, supplies, facility or other information of the Company was used and which was developed entirely on Employee's own time unless: (i) the Invention relates to the business of the Company or to the Company's actual or demonstrably anticipated research or development; or (ii) the Invention results from or relates to any work performed by Employee for the Company.

A.     Employee will promptly identify in writing to the Company all Inventions, whether or not patentable or copyrightable, made or conceived by Employee, either alone or with others, during his or her employment with the Company, and during the twelve-month period thereafter.

B.     Employee will maintain complete records of all his or her creative or inventive activities and will deliver such records, including, but not limited to,

Case 5:19-cv-00990-D Document 24-1 Filed 04/06/20 Page 53 of 73



manuals, drawings, software, notes, notebooks, photographs, emails and other documents, and all copies thereof, to the Company at the end of his or her employment relationship with the Company or as requested by the Company.

C.     Employee will assist the Company in every reasonable way (at the Company's expense) without further consideration or payment to Employee, both during Employee' employment and thereafter, to obtain and enforce the Company's rights to the Inventions in the United States and in any other country. Employee will, at the Company's request, both during Employee's employment and thereafter, execute all assignments of rights and other documents appropriate or necessary to ensure and perfect the Company's rights in such Inventions and to obtain patents, copyrights and any other form of legal protection.

D.     Employee warrants that the attached Exhibit A is a complete description of all Inventions excluded from this Agreement that Employee made prior to his or her employment by the Company.

3.     <u>Non-Solicitation</u>.  Employee agrees that during his or her employment by the Company and for a period of one (1) year subsequent to the end of his or her employment relationship with the Company, regardless of reason for termination or separation or who initiates the ending of such employment relationship, Employee will not, without the prior written consent of the Company, either directly or indirectly:

A.     contact, solicit, divert, attempt to solicit, attempt to contact or attempt to divert business from any Customer for or on behalf of a Competitor (as defined below);

B.     solicit, divert, attempt to solicit or attempt to divert the employment of any other individual who is or has been an employee of the Company at any time within a period of twelve (12) months prior to the date of the end of his or her employment relationship with the Company;

C.     For the purposes of this Paragraph 3, "Competitor" shall mean any person, business or other entity that: (i) provides services or products that do or can compete with or displace any service or products sold or being developed for sale by the Company during Employee's employment with the Company; or (ii) engages in any other business activities so similar in nature or purpose to those of the Company that they may or do displace business opportunities or customers of the Company; and

D.     For the purposes of this Paragraph 3, "Customer" shall be limited to any customer of the Company that Employee personally solicited, serviced, had management responsibilities for, or had substantive contact with on behalf of the Company during the last twelve (12) months of his or her employment with the Company.

Page 4 of 6



E.     Employee warrants that he or she is under no obligation to any former employer or third party that is in any way inconsistent with this Agreement or that imposes any restrictions on any work activities with the Company, except as described in the attached Exhibit B.

4.     General

A.     Employee has read this Agreement and understands the obligations and restrictions it contains.

B.     Employee is being given employment in consideration for accepting and binding himself or herself to this Agreement.  Employee's acceptance of this Agreement is crucial to the Company, and the Company would not employ Employee or expose Employee to Confidential Information if he or she did not sign this Agreement.

C.     In the event of a breach or a threatened breach of this Agreement by Employee, Employee acknowledges that the Company will suffer irreparable injury that may be difficult to calculate in monetary terms and that the Company shall be entitled, in addition to any other remedies otherwise available at law or in equity, to temporary restraining orders, preliminary injunctions and/or final injunctions enjoining such breach or threatened breach.   In the event the Company shall successfully enforce any part of this Agreement through legal proceedings, Employee agrees to pay the Company all costs and attorneys' fees reasonably incurred by the Company in connection therewith.

D.     The covenants in this Agreement shall be construed as covenants independent of one another and as obligations distinct from any other contract between Employee and the Company.  Any claim that Employee may have against the Company shall not constitute a defense to enforcement by the Company of this Agreement.    The parties to this Agreement expressly acknowledge that the provisions, or portions thereof, of this Agreement shall be deemed severable and the invalidity of or unenforceability of any provision, or portion thereof, shall not affect the validity or enforceability of the other provisions hereof.    If any provision, or portion thereof, of this Agreement is found unenforceable for any reason, it is the express intent of the parties that such provision, or portion thereof, shall be appropriately limited and given effect to the greatest extent that it may be enforceable in the discretion of the court or, in the alternative, such provision shall be severed in its entirety, if a court of competent jurisdiction determines a lesser limitation than what is stated is not appropriate.

E.     Except as set forth in paragraph 4D, no provision of this Agreement may be modified, waived or discharged by the parties unless such modification, waiver or discharge is agreed to in writing, and signed by Employee and by an

Page 5 of 6



authorized representative of the Company or by the respective parties' legal representatives and/or successors.

F.      Employee acknowledges that his or her obligations under this Agreement are in addition to any and all obligations concerning the same subject matter arising under applicable law including, without limitation, common law relating to fiduciary duties and common law and statutory law relating to trade secrets.

G.      Neither this Agreement nor any benefits hereunder are assignable by Employee, but the terms and provisions hereof are assignable by the Company without Employee's consent.

H.      The substantive laws of the state of North Carolina, excluding its conflicts of law rules, shall govern this Agreement.

I.      Employee consents to the exclusive jurisdiction and venue of the state and federal courts of Catawba County in North Carolina to hear and resolve disputes arising under this Agreement.

J.      Employee's employment with the Company is "at will", meaning that Employee's employment may be terminated by the Company or by Employee at any time without cause. This Agreement is not a contract of employment for any duration and nothing herein changes or affects in any way Employee's "at will" status.

K.      This Agreement constitutes the entire agreement between the Company and Employee with respect to the subject matter herein and no course of dealing or usage of trade shall be invoked to modify the terms and conditions of this Agreement. The terms and conditions contained in this Agreement supersede all prior oral or written understandings between the parties. There are no understandings or representations, express or implied, not expressly set forth in this Agreement.

EMPLOYEE: _____          Date: _11_/_2_/_2010_

Accepted

**CommScope, Inc. of North Carolina**

BY: _____          Date: _____

TITLE: _____

Page 6 of 6

# EXHIBIT 3

# COMMSCOPE®

## Employee Exit Statement
## Trade Secrets

The business and technical information developed and acquired by CommScope Technologies LLC. is among the Company's most valuable assets, and the value of this information will be destroyed by an unauthorized dissemination. All employees who have acquired knowledge of trade secret information during the course of their employment with CommScope have a legal obligation to protect and maintain the confidentiality of the trade secret information, both during and after employment. This legal obligation applies whether or not the Employee signs this Employee Exit Statement.

In addition, Employee acknowledges that (s)he has signed an Employee Confidentiality, Invention Assignment, and Non-Compete Agreement ('Agreement') and acknowledges having been given a copy of this Agreement. In accordance with the terms of that Agreement, Employee understands that (s)he is prohibited from using or disclosing any confidential information acquired during their employment with CommScope to anyone, without the prior consent of CommScope.

Employee has been reminded that this obligation of confidentiality continues upon and after Employee's termination date.

Employee has not taken and shall not take with him/her, upon leaving the employ of the Company, and original or copies of any drawings or other documents, or development or pre-production models containing or disclosing confidential information even though written or made by Employee and in his/her possession during employment, or any other confidential information whatsoever.

I hereby acknowledge that on this day, I have signed and received an exact copy of this Employee Exit Statement - Trade Secrets. I further acknowledge that my refusal to sign this Employee Exit Statement - Trade Secrets, shall not relieve me of my legal obligation to protect and maintain the confidentiality of all CommScope trade secret and confidential information.

Employee: _____    Date: 8/8/2018

CommScope, Inc.
Human Resources: _Betsy Bogart_    Date: 8/B/18

HR FORM 1047 (01/01)

**EXHIBIT 4**



## EMPLOYEE CONFIDENTIALITY, INVENTION
## ASSIGNMENT AND NON-SOLICITATION AGREEMENT

This Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement ("Agreement") by and between _Rob Cameron_ (the "Employee") and CommScope, Inc. of North Carolina, (the "Company"), is entered into this 9th day of _November_ 2010.

**WHEREAS**, Employee desires to work for and the Company desires to hire Employee on an "at will" basis; and

**WHEREAS**, Employee may, during the course of his or her employment with the Company, be given access to Confidential Information (as defined below); and

**WHEREAS**, it would be improper and inequitable for Employee to use Confidential Information for any purpose other than to benefit the Company or to disclose such Confidential Information to anyone outside of the Company, either during or subsequent to his or her employment with the Company, without the Company's approval; and

**WHEREAS**, Employee may alone or with others develop ideas, creations, inventions (patentable or not), improvements, discoveries, processes, products, devices or designs and works of authorship, whether copyrightable or not, including software and writings (hereinafter collectively referred to as "Inventions") during his or her employment and arising from or related to his or her employment; and

**WHEREAS**, both Employee and the Company agree that such Inventions are the sole property of the Company; and

**WHEREAS**, the Company has already invested and will continue to invest substantial time and money in developing the resources and environment for Employee to perform his or her job on behalf of the Company and has developed a base of customers or potential customers that Employee may be exposed to or introduced to by the Company solely for the benefit of the Company and the development, promotion and sale of the Company's products and services; and

**WHEREAS**, both Employee and the Company agree that Employee's use of Confidential Information is only for the benefit of the Company and that the Company's willingness to spend the time and money to train Employee, to expose Employee to its business and to its Confidential Information and to introduce Employee to its customers or potential customers is based on the assurances provided herein that Employee will refrain from soliciting either the employees or customers of the Company for a reasonable period of time at the end of his or her employment relationship with the Company.

**NOW, THEREFORE**, both Employee and the Company mutually agree as follows:



1.  <u>Confidentiality.</u>  As part of Employee's employment, the Employee may be provided, become aware of or develop information that is proprietary and/or confidential, including, but not limited to:  customer and potential customer information; sales, marketing and business plans; research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing, profit and cost information; customer and potential customer specifications; supplier information; Inventions (as defined above); and information about product design, research, development and capabilities.  Some of this information is highly secret, is not generally known outside of the Company, is valuable because of its secrecy and constitutes trade secrets under applicable law.  The types of information identified in this paragraph belong to the Company and are referred to in this Agreement as "Confidential Information."  Confidential Information may take the form of documents, be stored or transmitted electronically or exist in spoken words only.

   A.    Both during Employee's employment relationship with the Company and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company, or to a Company Officer, or to a third party if approved in writing prior to such use or disclosure by an authorized Officer of the Company.

   B.    Employee agrees to return to the Company at the end of his or her employment relationship with the Company, all Company property in his or her possession, custody or control, including, but not limited to, all Confidential Information that exists in tangible or electronic form.  Employee also agrees that upon the end of his or her employment relationship with the Company or in anticipation of or subsequent to such separation, he or she will not delete, move offsite or destroy any Company property, regardless of form without the express consent of the Company.

   C.    Employee shall return any Company-provided computer to the Company without deleting any information or programs thereon, otherwise disabling any operating system or corrupting or otherwise affecting the operation of, or the Company's ability to retrieve information from, the computer.

   D.    Upon request by the Company, Employee shall promptly provide to, and hereby agrees to allow the Company to inspect, his or her personal computer(s), hard drive(s) and/or other electronic storage medium or equipment upon which he or she has stored or transmitted Confidential Information in order to confirm that all Confidential Information has been removed or electronically destroyed.  In the event that all of the Confidential Information has not been destroyed, Employee agrees that the Company is authorized to erase, destroy or remove such Confidential Information, or retain possession of the personal computer(s), electronic storage medium or equipment (other than the Employee's personal files and programs) and provide Employee with a substitutes of substantially the

Case 5:19-cv-00099-BO Document 24-1 Filed 04/06/20 Page 61 of 73



same value, without further payment or authorization and regardless of where the computer(s), electronic storage medium or equipment is located.

E.    Employee agrees that he or she will not use or disclose to Company, its employees, agent or subcontractors any trade secret or confidential information of any third party, including any former employer, during his or her employment with the Company that he or she does not have the legal right to disclose. In case of doubt with respect to his or her obligations towards a prior employer, Employee shall consult with the Company.

F.    The obligations set forth in this Paragraph shall be without time or geographic limitation and shall survive and be enforceable after Employee's employment relationship with the Company ends so long as the information in question continues to be Confidential Information. Confidential Information will no longer be considered confidential after a date on which the Employee can substantiate, as established by independent documentary proof, that the subject information: (a) has become publicly known through no wrongful act of the Employee, or (b) is approved for release or disclosure by prior written authorization of an authorized Officer of the Company. In the alternative, and only in the event a court of competent jurisdiction determines that this provision must contain a time limitation in order to be enforceable, the applicable time limitation shall be four (4) years from the Employee's last day of employment with the Company.

2.    Inventions. Employee agrees to grant, and hereby does grant and assign to the Company, all rights and title to all Inventions (including, but not limited to all rights and title to any patent, patent application, copyright or copyright application related thereto) made or conceived by Employee during his or her employment with the Company, and during the twelve-month period thereafter to the extent they relate to research and development carried on by the Company during Employee's employment. All such Inventions, including Inventions conceived after the execution date of this Agreement, are hereby assigned to the Company and are the sole and exclusive property of the Company. This provision does not apply to any inventions made by Employee for which no Confidential Information or equipment, supplies, facility or other information of the Company was used and which was developed entirely on Employee's own time unless: (i) the Invention relates to the business of the Company or to the Company's actual or demonstrably anticipated research or development; or (ii) the Invention results from or relates to any work performed by Employee for the Company.

A.    Employee will promptly identify in writing to the Company all Inventions, whether or not patentable or copyrightable, made or conceived by Employee, either alone or with others, during his or her employment with the Company, and during the twelve-month period thereafter.

B.    Employee will maintain complete records of all his or her creative or inventive activities and will deliver such records, including, but not limited to,

Case 5:19-cv-00009-BKD-CSEADEDocument 24-1entFiled 04/06/20/23/19e 62age 73of 7



manuals, drawings, software, notes, notebooks, photographs, emails and other documents, and all copies thereof, to the Company at the end of his or her employment relationship with the Company or as requested by the Company.

C.    Employee will assist the Company in every reasonable way (at the Company's expense) without further consideration or payment to Employee, both during Employee' employment and thereafter, to obtain and enforce the Company's rights to the Inventions in the United States and in any other country. Employee will, at the Company's request, both during Employee's employment and thereafter, execute all assignments of rights and other documents appropriate or necessary to ensure and perfect the Company's rights in such Inventions and to obtain patents, copyrights and any other form of legal protection.

D.    Employee warrants that the attached Exhibit A is a complete description of all Inventions excluded from this Agreement that Employee made prior to his or her employment by the Company.

3.    <u>Non-Solicitation</u>.  Employee agrees that during his or her employment by the Company and for a period of one (1) year subsequent to the end of his or her employment relationship with the Company, regardless of reason for termination or separation or who initiates the ending of such employment relationship, Employee will not, without the prior written consent of the Company, either directly or indirectly:

A.    contact, solicit, divert, attempt to solicit, attempt to contact or attempt to divert business from any Customer for or on behalf of a Competitor (as defined below);

B.    solicit, divert, attempt to solicit or attempt to divert the employment of any other individual who is or has been an employee of the Company at any time within a period of twelve (12) months prior to the date of the end of his or her employment relationship with the Company;

C.    For the purposes of this Paragraph 3, "Competitor" shall mean any person, business or other entity that: (i) provides services or products that do or can compete with or displace any service or products sold or being developed for sale by the Company during Employee's employment with the Company; or (ii) engages in any other business activities so similar in nature or purpose to those of the Company that they may or do displace business opportunities or customers of the Company; and

D.    For the purposes of this Paragraph 3, "Customer" shall be limited to any customer of the Company that Employee personally solicited, serviced, had management responsibilities for, or had substantive contact with on behalf of the Company during the last twelve (12) months of his or her employment with the Company.


E.     Employee warrants that he or she is under no obligation to any former employer or third party that is in any way inconsistent with this Agreement or that imposes any restrictions on any work activities with the Company, except as described in the attached Exhibit B.

4.     <u>General</u>

A.     Employee has read this Agreement and understands the obligations and restrictions it contains.

B.     Employee is being given employment in consideration for accepting and binding himself or herself to this Agreement.  Employee's acceptance of this Agreement is crucial to the Company, and the Company would not employ Employee or expose Employee to Confidential Information if he or she did not sign this Agreement.

C.     In the event of a breach or a threatened breach of this Agreement by Employee, Employee acknowledges that the Company will suffer irreparable injury that may be difficult to calculate in monetary terms and that the Company shall be entitled, in addition to any other remedies otherwise available at law or in equity, to temporary restraining orders, preliminary injunctions and/or final injunctions enjoining such breach or threatened breach.   In the event the Company shall successfully enforce any part of this Agreement through legal proceedings, Employee agrees to pay the Company all costs and attorneys' fees reasonably incurred by the Company in connection therewith.

D.     The covenants in this Agreement shall be construed as covenants independent of one another and as obligations distinct from any other contract between Employee and the Company.   Any claim that Employee may have against the Company shall not constitute a defense to enforcement by the Company of this Agreement.    The parties to this Agreement expressly acknowledge that the provisions, or portions thereof, of this Agreement shall be deemed severable and the invalidity of or unenforceability of any provision, or portion thereof, shall not affect the validity or enforceability of the other provisions hereof.    If any provision, or portion thereof, of this Agreement is found unenforceable for any reason, it is the express intent of the parties that such provision, or portion thereof, shall be appropriately limited and given effect to the greatest extent that it may be enforceable in the discretion of the court or, in the alternative, such provision shall be severed in its entirety, if a court of competent jurisdiction determines a lesser limitation than what is stated is not appropriate.

E.     Except as set forth in paragraph 4D, no provision of this Agreement may be modified, waived or discharged by the parties unless such modification, waiver or discharge is agreed to in writing, and signed by Employee and by an

Case 5:19-cv-00099-BO-CSE Document 24-1 Filed 04/06/20 Page 64 of 73



authorized representative of the Company or by the respective parties' legal representatives and/or successors.

F.     Employee acknowledges that his or her obligations under this Agreement are in addition to any and all obligations concerning the same subject matter arising under applicable law including, without limitation, common law relating to fiduciary duties and common law and statutory law relating to trade secrets.

G.     Neither this Agreement nor any benefits hereunder are assignable by Employee, but the terms and provisions hereof are assignable by the Company without Employee's consent.

H.     The substantive laws of the state of North Carolina, excluding its conflicts of law rules, shall govern this Agreement.

I.     Employee consents to the exclusive jurisdiction and venue of the state and federal courts of Catawba County in North Carolina to hear and resolve disputes arising under this Agreement.

J.     Employee's employment with the Company is "at will", meaning that Employee's employment may be terminated by the Company or by Employee at any time without cause.  This Agreement is not a contract of employment for any duration and nothing herein changes or affects in any way Employee's "at will" status.

K.     This Agreement constitutes the entire agreement between the Company and Employee with respect to the subject matter herein and no course of dealing or usage of trade shall be invoked to modify the terms and conditions of this Agreement.  The terms and conditions contained in this Agreement supersede all prior oral or written understandings between the parties.   There are no understandings or representations, express or implied, not expressly set forth in this Agreement.

EMPLOYEE: _____          Date: __11 / 9 / 10__

Accepted

**CommScope, Inc. of North Carolina**

BY: _____          Date: __11 / 9 / 10__

TITLE: __HR Business Partner__

Case 5:19-cv-00099-KDB-DCK Document 24-1 Filed 04/06/20 Page 65 of 73

# EXHIBIT 5

# SEPARATION AND RELEASE AGREEMENT

This Separation and Release Agreement ("Agreement") is made between you, Robert Cameron, and CommScope, Inc. of North Carolina, on its own behalf and on behalf of its wholly-owned subsidiary that employs you, and their respective officers, directors, employees, foreign and domestic subsidiaries, benefit plans and plan administrators, affiliates, agents, joint ventures, attorneys, successors and/or assigns (collectively referred to as "Company").

**1.     Valuable Consideration**

In exchange for entering into and complying with the provisions of this Agreement, Company agrees to provide you with the following consideration:

A.     Company will provide you with severance pay in the amount of $74,138.46 (which is equivalent to 34 weeks of your current base salary), less applicable withholding taxes and FICA, absent revocation of this Agreement as described in Paragraph 9. The compensation identified above will be paid in a lump sum payment on or before the date of the Company's second regular payroll interval after the revocation period described in Paragraph 9 has ended. Should you revoke your Agreement as provided in Paragraph 9, all payment obligations of the Company under this section 1 are void.

B.     If you are eligible for and elect COBRA coverage under the Company's health plan (the "Plan"), Company will continue paying to the Plan, on your behalf, the Company share of your active employee health insurance premium, plus any additional amounts required by law, to continue your current health insurance coverage for a period up to 34 weeks, commencing February 1, 2019 ("COBRA Supplement"). This benefit is intended to provide coverage only if you are without health insurance through another employer. If you become eligible for other employer-sponsored health insurance during the 34 weeks, you must notify Company of your new eligibility, at which time Company will cease this benefit, prior to the end of the 34 weeks. At the end of the COBRA Supplement, continued COBRA eligibility and payments will be your sole responsibility in accordance with COBRA regulations and the terms of the Plan, except to the extent federal law requires an additional subsidy on the part of the Company. Details regarding COBRA coverage will be provided to you under separate cover.

C.     You will be eligible for outplacement assistance if you choose to utilize it. In accordance with Company policy, cash will not be paid in lieu of outplacement assistance.

You acknowledge that the consideration described above is valuable consideration over and above the benefits to which you would otherwise be entitled by law, contract or under the policies and practices of Company, and that it is being provided to you in exchange for entering into and complying with this Agreement. Company will not be obligated to provide you with any of the foregoing consideration until the revocation period set forth in Paragraph 9 has expired and this Agreement becomes legally binding.

In addition to the foregoing enhanced consideration, Company will pay you for the PTO/Vacation days that you have accrued but have not used as of January 18, 2019. Information regarding the transfer or distribution of your CommScope Retirement Savings Plan 401(k) account will be provided to you under separate cover by Vanguard.

Except for the enhanced consideration in paragraphs A through C above which you will be paid if you accept the terms of this Agreement and do not revoke your acceptance, you acknowledge and confirm that (i) you have been paid for all hours worked, including overtime, bonuses or incentives, as may be applicable, and (ii) have not suffered any on-the-job injury for which you have not already filed a claim, and (iii) have been reimbursed for any and all business expenses incurred.

1

## 2. Separation Date

On January 18, 2019 (the "Separation Date"), your employment will officially terminate. Except as otherwise expressly provided in this Agreement, all Company benefits will terminate on the Separation Date. Following the Separation Date, you are ineligible to return to CommScope as a regular employee, contractor, or consultant for a period of time equal to the period of the Company's COBRA subsidy to you identified in Section 1(B).

## 3. Release and Waiver and Promise Not to Sue

On behalf of yourself, your heirs, agents, executors, administrators, attorneys, successors and assigns, you hereby release and discharge Company, its officers, directors, employees, agents, attorneys, corporate affiliates and successors and their officers, directors, employees agents and attorneys ("Releasees") from any and all claims (including attorneys fees and court costs), charges, actions, causes of action, demands, damages and liabilities of any kind whatsoever, both known and unknown, in law or in equity, which you have or ever had, against Company or any of the Releasees from the beginning of time through the date of your execution of this Agreement, including, without limitation, those arising from or in connection with your employment with, or separation of employment from, Company. This release and waiver includes, but is not limited to:

    A.    any claims for wrongful termination, defamation, intentional infliction of emotional distress, constructive discharge, intentional interference with a contractual relationship or any other common law claims;

    B.    any claims for the breach of any written, implied or oral contracts, including any written or implied employment contract;

    C.    any claims of discrimination, harassment or retaliation based on age, national origin, ancestry, color, race, religion, sex, sexual orientation, physical or mental disability; medical condition or other protected status;

    D.    except for the payments provided pursuant to Paragraph 1 above, any claim for payments of any nature, including, but not limited to, wages, discretionary bonuses or the monetary equivalent of benefits;

    E.    any claims or non-accrued rights under any benefit plan or program of Company; and

    F.    any claims asserting any re-instatement or re-employment rights with Company.

This release and waiver includes all claims in law and in equity that may arise under common law and all federal, state and local statutes, ordinances, rules, regulations and orders, including, but not limited to any claim or cause of action in law or in equity based on the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 (including amendments made through the Civil Rights Act of 1991), the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12(0), et seq.; the Civil Rights Acts of 1866, 1871 and 1991, the Rehabilitation Act of 1973, the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.; the Family and Medical Leave Act of 1933, 29 U.S.C. § 2601 et seq.; the Employee Polygraph Protection Act of 1988, as amended, the Genetic Information Non-Discrimination Act of 2008, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, Executive Order 11246, Section 1981 of U.S.C. Title 42, the Sarbanes-Oxley Act of 2002, as amended, Consolidated Omnibus Budget reconciliation Act of 1985 ("COBRA");Uniformed Services Employment and Re-Employment Rights Act, ("USERRA"), Sections 1981 through 1988 of Title 42 of the United States Code; Immigration Reform Control Act; Occupational Safety and Health Act ("OSHA"); the Fair Criminal Record Screening Amendment Act of 2014; the Federal Equal Pay Act of 1963, as amended, Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621, et seq.; the Older Workers Benefit Protection Act ("OWBPA") and the Worker Adjustment and Retraining Notification Act (WARN); Texas Labor Code § 21.001, *et seq.* (specifically including the Texas Payday Law the Texas Anti-Retaliation Act, Chapter 21 of the Texas Labor Code, and the Texas Whistleblower Act), and any other applicable federal, state, county or local human rights ordinances, as each of them has been or may be amended.

2

Both parties acknowledge that this Agreement does not limit either party's right to file a complaint or participate in an investigative proceeding of any federal, state or local governmental agency, including, but not limited to, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety & Health Administration, the Department of Justice, and the Securities and Exchange Commission. To the extent permitted by law, Employee agrees that if such an administrative claim is made, Employee shall not be entitled to recover any individual monetary relief or other individual remedies. This provision does not apply to an award from an agency (such as the Securities and Exchange Commission or the Department of Justice) for providing information related to a whistleblower claim.

This release and waiver also includes your right to attorneys' fees, monetary relief or any other recovery or remedy whatsoever as the result of legal action brought by or on your behalf by any federal, state or local administrative agency, or any other third party, relating to any claim governed by this Agreement, except as is set forth above.

You further agree to waive your right to become a member of any class in which claims are asserted against any of the Releasees that arise out of, or are related in any way to, your employment or the separation of your employment with Company and that involve events which occurred on or before the date you signed this Agreement. If you are made a member of a class in any such proceeding, you agree to opt out of the class at the first opportunity afforded to you after learning of your inclusion. In this regard, you agree that you will sign, without objection or delay, an "opt-out" form presented to you either by the court in which the proceeding is pending, or by counsel for Company.

You also agree to waive your right to voluntarily aid in the institution or prosecution of any claim, suit or action brought against any of the Releasees regarding any claim governed by this Agreement, unless you are ordered to do so by a court of competent jurisdiction and have first afforded Company and any other applicable Releasees the opportunity to contest such court order.

This Agreement does not prohibit or prevent you from engaging in activities that are not waivable and protected by applicable federal and state laws, including the right to file a charge or complaint with the EEOC, the National Labor Relations Board or other federal, state or local governmental agency or commission ("Government Agencies"). You further understand that this Agreement does not limit your ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agencies in connection with any charge or complaint, whether filed by you, on your behalf, or by any other individual.

In addition, you agree not to file a lawsuit or other legal claim or charge against any of the Releasees, in any forum for any reason, to assert any claims, laws or theories covered by the above waiver and release language or that otherwise are based on facts that occurred prior to, or that exist as of, the time you execute this Agreement. Excepted from this promise not to sue are claims under the ADEA to the extent such an exception is required by law. If you sue any of the Releasees in violation of this Agreement, you shall be liable to the Company and any applicable Releasees for its reasonable attorneys' fees and other litigation costs incurred in defending against such a suit. Alternatively, if you sue any of the Releasees in violation of this Agreement, the Company can require you to return all monies and other benefits paid to you pursuant to this Agreement minus $100.

4.      **Confidentiality**

You acknowledge that as a result of your employment with Company, you have had access to confidential and proprietary business information of Company, including, but not limited to, insured claims and other insurance matters, personnel information, product information, vendor and supplier information, business decisions, plans and strategies, research and development activities, manufacturing and marketing techniques, technological and engineering data, processes and inventions, legal matters affecting Company and Company's business, customer and prospective customer information, trade secrets, bid prices, contractual terms and arrangements, prospective business transactions, joint ventures, pricing strategies, and financial and business forecasts ("Confidential Information"). Confidential Information also includes information, knowledge or data of any third party doing business with Company that the third party has identified as being confidential. You agree not to use or to disclose to anyone any Confidential Information at any time in the future without the prior written authorization of Company.

Anything herein to the contrary notwithstanding, you shall not be restricted from: (i) disclosing information that is required to be disclosed by law, court order or other valid and appropriate legal process; *provided, however*, that in

3

the event such disclosure is required by law, you shall provide Company with prompt notice of such requirement so that Company may seek an appropriate protective order prior to any such required disclosure by you; (ii) reporting possible violations of federal, state, or local law or regulation to any governmental agency or entity, or from making other disclosures that are protected under the whistleblower provisions of federal, state, or local law or regulation, and you shall not need the prior authorization of the Company to make any such reports or disclosures and shall not be required to notify the Company that you have made such reports or disclosures; (iii) disclosing a trade secret (as defined by 18 U.S.C. § 1839) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, in either event solely for the purpose of reporting or investigating a suspected violation of law; or (iv) disclosing a trade secret (as defined by 18 U.S.C. § 1839) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

5.      **Non- Disparagement, Reporting and Cooperation**

You agree not to do or say anything, including but not limited to communicating on the Internet, (including but not limited to any posting or reference on any social networking site, e.g., FaceBook, LinkedIn, Twitter, etc) or via e-mail, telephone, face-to-face communication, or otherwise that (i) criticizes or disparages Company and/or any of the Releasees, or their respective management, practices, policies, products or services; (ii) disrupts or impairs the normal, ongoing business operations of Company; or (iii) harms the business reputation of Company with its employees, customers, suppliers, contractors or the public.  You agree that you will not make any statement to any third party that is intended to or is reasonably likely to slander, libel or defame Company or any of its directors, officers or employees, or to damage Company's business reputation.  This Section, however, shall not prohibit you from providing truthful testimony in response to a subpoena or a court order, or from providing truthful information to a Government Agency.

Your signature below affirms that you have (a) disclosed to the Company's Corporate Ethics & Compliance Officer, or through the CommAlert system, any known or suspected instances of illegal activity or practices or violations of the Code of Ethics and Business Conduct, and (b) identified in writing to the Company all Inventions, whether or not patentable or copyrightable, made or conceived by you, either alone or with others, during your employment with the Company, and will so for the twelve-month period thereafter.  For purposes of this Agreement, "Inventions" means, collectively and individually, your ideas, creations, inventions (patentable or not), improvements, discoveries, processes, products, devices or designs and works of authorship, whether copyrightable or not, including software and writings during your employment and arising from or related to your employment with the Company.

You agree that you will give your assistance and cooperation willingly, upon reasonable advance notice with due consideration for other business or personal commitments, in any matter relating to your position with Company as Company may reasonably request, including your attendance and truthful testimony where deemed appropriate by the Company, with respect to any investigation or Company's defense or prosecution of any existing or future claims or litigations or other proceedings relating to matters in which you were involved or potentially had knowledge by virtue of your employment with Company.

You further hereby re-affirm all prior commitments to assist the Company in every reasonable way (at the Company's expense), without further consideration or payment to you unless required by law, to obtain and enforce the Company's rights to the Inventions in the United States and in any other country.   You agree to, at the Company's request and without further payment or compensation, execute all assignments of rights and other documents appropriate or necessary to ensure and perfect the Company's rights in Inventions and to obtain patents, copyrights and any other form of legal protection.

6.      **Remedies**

You understand and agree that in the event you violate any provision of this Agreement, including the provisions set forth in Paragraphs 3, 4 or 5, then (a) Company shall have the right to apply for and receive an injunction to restrain any violation of this Agreement; (b) Company shall have the right to immediately discontinue any enhanced benefits provided under this Agreement; (c) you will be obligated to reimburse Company its costs and expenses incurred in defending your lawsuit and enforcing this Agreement, including Company's court costs and reasonable attorneys fees; and (d) as an alternative to (c), at Company's option, you shall be obligated upon demand to repay Company the cost of all but $500 of the enhanced benefits paid under this Agreement.  You acknowledge and agree that the covenants contained in this Paragraph 6 shall not affect the validity of this Agreement and shall not be deemed to be a penalty

4

or forfeiture. The remedies available to Company pursuant to this Paragraph 6 are in addition to, and not in lieu of, any remedies which may be available under statutory and/or common law relating to trade secrets and the protection of Company's business interests generally.

7.     **Return of Company Property & Expense Reporting**

Upon your separation from the Company, you agree to immediately return all Company property and equipment in your possession or under your control, including but not limited to, keys, cellular telephones, laptop computers, computer hardware and software, identification badges, Blackberry or other hand-held devices, pagers and company credit cards.

8.     **Consideration Period and Disclosures**

You have forty-five (45) calendar days from your receipt of this Agreement to consider whether to sign it. If you do not deliver a signed copy of this Agreement to your local Human Resources Representative by the close of business (4:30 pm CST) on March 2, 2019, the offer contained in this Agreement is automatically withdrawn. You and Company agree that an immaterial change to any term of this Agreement shall not extend or recommence the consideration period. Attached to this Agreement are the disclosures of certain age related information as required by law.

9.     **Revocation Period**

For a period of seven (7) days after you sign this Agreement, you may revoke the Agreement by delivering written notice of your revocation to the Company, Senior Vice President of Human Resources, 1100 CommScope Place S.E., Hickory, North Carolina 28603-0339. This Agreement does not become effective or enforceable until the revocation period has expired.

10.    **Legal Representation**

This is a legal document and Company advises you to consult with an attorney prior to signing this Agreement.

11.    **Entire Agreement, Enforcement and Severability**

This Agreement sets forth the entire agreement between you and Company and supersedes any prior written or verbal discussions, agreements or understandings between the parties pertaining to the subject matter hereof. You and Company agree and acknowledge that no other promises or agreements have been offered in exchange for this Agreement (other than those described herein) and that no other promises or agreements between the parties will be binding unless they are in writing and signed by both parties.

You and Company further agree that if any provision of this Agreement is held to be invalid or legally unenforceable, that provision will be deemed severed from the Agreement and will not affect the validity of the remainder of this Agreement.

12.    **Non-Admission**

You and Company agree that the negotiation and execution of this Agreement, and any actions taken in the fulfillment of representations contained herein, do not constitute an admission by either party of any wrongdoing or liability of any kind.

13.    **IRC Section 409A Intent**

This Agreement shall be interpreted and administered in a manner so that any amount or benefit payable hereunder shall be paid or provided in a manner that is either exempt from or compliant with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and applicable Internal Revenue Service guidance and Treasury Regulations issued thereunder. The tax treatment of the benefits provided under the Agreement is not

5

warranted or guaranteed to you, who are responsible for all taxes assessed on any payments made pursuant to this Agreement, whether under Section 409A of the Code or otherwise. Neither Company nor its directors, officers, employees or advisers shall be held liable for any taxes, interest, penalties or other monetary amounts owed by you as a result of the application of Section 409A of the Code.

14.    Governing Law

This Agreement will be construed and enforced in accordance with North Carolina state law, excluding its conflict of law rules, and you and Company agree to submit to personal jurisdiction in the state of North Carolina and to venue in its courts.

**BY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE THAT YOU: (i) HAVE READ AND UNDERSTAND ALL OF THE PROVISIONS OF THIS AGREEMENT; (ii) ARE HEREBY ADVISED IN WRITING OF YOUR RIGHT TO CONSULT WITH AN ATTORNEY OF YOUR CHOOSING PRIOR TO EXECUTING THIS AGREEMENT; and (iii) HAVE SIGNED THIS AGREEMENT VOLUNTARILY AND OF YOUR OWN FREE WILL.**

EMPLOYEE                                                    CommScope, Inc. of North Carolina

_____                        _____
Signature                                                      Signature

___1/18/19___                                           ___1/18/19___
Date                                                            Date

6

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
CommScope, Inc.

## DEFENDANTS
Rosenberger Technology (Kunshan) Co. Ltd., et al.

**(b)** County of Residence of First Listed Plaintiff   Catawba County, NC
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pearlynn G. Houck, Robinson, Bradshaw & Hinson, P.A.,
101 N. Tryon Street, Suite 1900  Charlotte, NC 28246
704.377. 8396

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability   Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel &   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander    Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability    Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 340 Marine   ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability   Injury Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle   **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle   ☐ 370 Other Fraud | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | Product Liability   ☐ 371 Truth in Lending | Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | ☐ 360 Other Personal   ☐ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | |
| | Injury    Property Damage | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☒ 890 Other Statutory Actions |
| | ☐ 362 Personal Injury -   ☐ 385 Property Damage | Leave Act | | ☐ 891 Agricultural Acts |
| | Medical Malpractice   Product Liability | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/   ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment   **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | Other   ☐ 550 Civil Rights | | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| |   ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Defend Trade Secrets Act, 18 USC 1836 et seq.
Brief description of cause:
Trade secret misappropriation

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.    DEMAND $    CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE     DOCKET NUMBER

DATE   7/23/19     SIGNATURE OF ATTORNEY OF RECORD    *Pearlynn G. Houck*

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE